# LOWENFIELD v. PHELPS, SECRETARY, LOUISIANA DEPARTMENT OF CORRECTIONS, ET AL.

No. 86-6867.  Argued October 14, 1987—Decided January 13, 1988

232

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined, and in Part III of which, except for the last sentence thereof, STEVENS, J., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in Part I of which STEVENS, J., joined, *post*, p. 246.

*David Klingsberg* argued the cause for petitioner. With him on the briefs was *Gary S. Guzy.*

*John M. Mamoulides* argued the cause for respondents. With him on the brief were *William J. Guste, Jr.,* Attorney General of Louisiana, and *Dorothy A. Pendergast.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.†

Petitioner, sentenced to death by the Louisiana state courts, makes two federal constitutional attacks on his sentence. He first contends that the trial court impermissibly coerced the jury to return a sentence of death by inquiries it made to the jury and a supplemental charge which it gave to the jury following the receipt of a communication from that body. Petitioner's second contention is that the death sentence violates the Eighth Amendment to the United States Constitution because the single "aggravating circumstance" found by the jury and upheld by the Supreme Court of Louisiana merely duplicates an element of the underlying offense of first-degree murder of which he was convicted at the guilt stage. We reject both of these contentions.

## I

Petitioner was charged with killing a woman with whom he had lived, three members of her family, and one of her male friends. The jury found petitioner guilty of two counts of manslaughter and three counts of first-degree murder; an essential element of the latter verdicts was a finding that petitioner intended "to kill or inflict great bodily harm upon more than one person." La. Rev. Stat. Ann. § 14:30A(3) (West 1986).

---

\*Briefs of *amicus curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson, Paul J. Larkin, Jr.,* and *Sara Criscitelli;* and for the State of Arkansas by *J. Steven Clark,* Attorney General, and *Clint Miller,* Assistant Attorney General.

†JUSTICE STEVENS joins Part III of this opinion, except for the last sentence.

The jury commenced its sentencing deliberations on the same day that it returned the verdict of guilt, and the judge's charge to them in this second phase of the trial included the familiar admonition that the jurors should consider the views of others with the objective of reaching a verdict, but that they should not surrender their own honest beliefs in doing so. The court also charged the jury that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment without the possibility of probation, parole, or suspension of sentence.

The jury was allowed to retire late in the evening, and reconvene the next day. During the afternoon of that day a note came from the foreman of the jury stating that the jury was unable to reach a decision at that time, and requesting that the court again advise the jury as to its responsibilities. The jury was called back. The court provided a piece of paper to each juror and asked each to write on the paper his or her name and the answer to the question whether "further deliberations would be helpful in obtaining a verdict." The jurors complied, and were asked to retire to the jury room. The papers revealed eight answers in the affirmative—that more deliberation would be helpful—and four in the negative. Defense counsel renewed a previously made motion for a mistrial, arguing that the jury was obviously hung. The trial court denied the motion, noting that this was the first sign that the jury was having trouble reaching a verdict in the penalty phase. The court directed that as previously agreed upon the jury would return to the courtroom and be instructed again as to its obligations in reaching a verdict.

When the jurors returned to the courtroom a new note from them was given to the judge. This note stated that some of the jurors had misunderstood the question previously asked. The judge polled the jury again using the same method but changing the question slightly; the judge asked, "Do you feel that any further deliberations will enable you to arrive at a verdict?" App. 55. This time 11 jurors an-

swered in the affirmative and 1 in the negative. The court then reinstructed the jury:

> "Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.
>
> "When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> "Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." *Id.*, at 56.

Defense counsel did not object to either poll, to the manner in which the polls were conducted, or to the supplemental instruction. The jury resumed its deliberations and in 30 minutes returned with a verdict sentencing petitioner to death on all three counts of first-degree murder. In support of all three sentences, the jury found the statutory aggravating circumstance of "knowingly creat[ing] a risk of death or great bodily harm to more than one person." La. Code Crim. Proc. Ann., Art. 905.4(d) (West 1984). One death sentence was additionally supported by the aggravating circumstance that "the victim was a witness in a prosecution against the defendant. . . ." Art. 905.4(h).

On direct appeal, the Louisiana Supreme Court upheld the convictions and sentences. *State* v. *Lowenfield*, 495 So. 2d 1245 (1985), cert. denied, 476 U. S. 1153 (1986). The court

ruled that the evidence was insufficient to support the aggravating circumstance that the victim was a witness in a prosecution against the defendant, but concluded that the remaining aggravating circumstance was established by the evidence and was sufficient to support the sentences. 495 So. 2d, at 1256–1258. The court went on to hold that the trial court had not abused its discretion in declining to declare a mistrial during sentencing when the jury indicated that it was having difficulty reaching a verdict. "This court has rejected the construction that the court is required to declare a deadlock at the first sign of trouble." *Id.*, at 1259. Finally, the court rejected petitioner's argument that the judge had coerced the sentence recommendations from the jury. "It is a well settled proposition that when the court is informed by a jury that they are having difficulty in agreeing, it is not error for the court to impress upon them the importance of the case, urge them to come to agreement, and send them back for further deliberation." *Ibid.*

Subsequently petitioner sought habeas corpus from the United States District Court for the Eastern District of Louisiana. Petitioner raised, *inter alia*, the two issues now before this Court: whether a sentence of death may validly rest upon a single aggravating circumstance that is a necessary element of the underlying offense of first-degree murder, and whether the judge had coerced the sentence verdicts from the jury. The District Court denied relief and a divided panel of the United States Court of Appeals for the Fifth Circuit affirmed. 817 F. 2d 285 (1987). The panel unanimously rejected the aggravating circumstance claim. *Id.*, at 289. The majority went on to conclude: "there is no showing of coercion; the record certainly does not demonstrate coercion sufficient to render the trial fundamentally unfair." *Id.*, at 293. The dissenting judge argued that the combination of the supplemental instruction to the jury and the polling of the jury as to the usefulness of further deliberations constituted improper coercion. *Id.*, at 299–303.

## II

Our review of petitioner's contention that the jury was improperly coerced requires that we consider the supplemental charge given by the trial court "in its context and under all the circumstances." *Jenkins* v. *United States*, 380 U. S. 445, 446 (1965) *(per curiam)*. The use of a supplemental charge has long been sanctioned. Nearly a century ago in *Allen* v. *United States*, 164 U. S. 492 (1896), this Court reviewed a charge similar but by no means identical to that given to the Louisiana jury here, and concluded that it was not reversible error even within the federal system. The defendant in that case had been sentenced to death by Judge Parker in the Western District of Arkansas, exercising a jurisdiction unique among federal courts. The judge's charge is not set out verbatim in the opinion of this Court, but it differed from the charge given in the present case in that the *Allen* charge urged the minority to consider the views of the majority, and ask themselves whether their own views were reasonable under the circumstances. This Court upheld the conviction and sentence against the defendant's claim of coercion, saying:

> "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself." *Id.*, at 501–502.

The continuing validity of this Court's observations in *Allen* are beyond dispute, and they apply with even greater

force in a case such as this, where the charge given, in contrast to the so-called "traditional *Allen* charge," does not speak specifically to the minority jurors.[1]  But in this case one of the purposes served by such a charge—the avoidance of the societal costs of a retrial—is not present because Louisiana law provides that if the jury hangs, the court shall impose a sentence of life imprisonment.  La. Code Crim. Proc. Ann., Art. 905.8 (West 1984).  Petitioner naturally urges that this difference makes the charge here impermissible under the Due Process Clause and the Eighth Amendment. The difference between the division of function between the jury and judge in this case and the division in *Allen* obviously weighs in the constitutional calculus, but we do not find it dispositive.  The State has in a capital sentencing proceeding a strong interest in having the jury "express the conscience of the community on the ultimate question of life or death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968).  Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity on the first ballot, the court would incontestably have had the authority to insist that they deliberate further.  This is true even in capital cases such as this one and *Allen*, even though we are naturally mindful in such cases that the "quali-

---

[1] All of the Federal Courts of Appeals have upheld some form of a supplemental jury charge.  See *United States* v. *Angiulo*, 485 F. 2d 37 (CA1 1973); *United States* v. *Burke*, 700 F. 2d 70, 80 (CA2), cert. denied, 464 U. S. 816 (1983); *United States* v. *Fioravanti*, 412 F. 2d 407, 414–420 (CA3), cert. denied *sub nom. Panaccione* v. *United States*, 396 U. S. 837 (1969); *United States* v. *Sawyers*, 423 F. 2d 1335 (CA4 1970); *United States* v. *Kelly*, 783 F. 2d 575, 576–577 (CA5), cert. denied, 479 U. S. 889 (1986); *United States* v. *Scott*, 547 F. 2d 334 (CA6 1977); *United States* v. *Silvern*, 484 F. 2d 879 (CA7 1973) (en banc); *Potter* v. *United States*, 691 F. 2d 1275 (CA8 1982); *United States* v. *Bonam*, 772 F. 2d 1449, 1450 (CA9 1985); *United States* v. *McKinney*, 822 F. 2d 946 (CA10 1987); *United States* v. *Rey*, 811 F. 2d 1453 (CA11), cert. denied, 484 U. S. 830 (1987); *United States* v. *Thomas*, 146 U. S. App. D. C. 101, 449 F. 2d 1177 (1971) (en banc).

tative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978).

Petitioner relies on this Court's decision in *Jenkins* v. *United States, supra*,[2] but we think that case affords him no help. There the jury had sent a note to the judge to the effect that it was unable to agree upon a verdict; the judge then gave additional instructions to the jury, in the course of which he said: "'You have got to reach a decision in this case.'" *Id.*, at 446. This Court concluded that "in its context and under all the circumstances the judge's statement had the coercive effect attributed to it." *Ibid*. The difference between the language used there and the language used in the present case is sufficiently obvious to show the fallacy of petitioner's reliance. The same is true of the colloquy between the judge and the foreman of the jury in *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 459 (1978), upon which petitioner also relies.

Petitioner argues, however, that the coercive effect of the supplemental charge was exacerbated by inquiries made to the jury by the trial court. In *Brasfield* v. *United States*, 272 U. S. 448 (1926), the trial court had, after deliberations stalled, inquired as to how the jury was divided, and was informed simply that the jury stood nine to three. The jury resumed deliberations and subsequently found the defendants guilty. This Court concluded that the inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear "in some degree, serious although not measurable, an improper influence upon the jury." *Id.*, at 450. Although the deci-

---

[2] We note that our ruling in *Jenkins* v. *United States* was based on our supervisory power over the federal courts, cf. *United States* v. *Hale*, 422 U. S. 171, 180, n. 7 (1975), and not on constitutional grounds. The *Jenkins* Court cited no provision of the Constitution, but rather relied upon other cases involving the exercise of supervisory powers. 380 U. S., at 446.

sion in *Brasfield* was an exercise of this Court's supervisory powers,[3] it is nonetheless instructive as to the potential dangers of jury polling.

Petitioner's attempt to fit the instant facts within the holding of *Brasfield* is, however, unavailing. Here the inquiry as to the numerical division of the jury was not as to how they stood on the merits of the verdict, but how they stood on the question of whether further deliberations might assist them in returning a verdict. There is no reason why those who may have been in the minority on the merits would necessarily conclude that further deliberation would not be helpful, or that those in the majority would necessarily conclude otherwise. The two questions are clearly independent of one another. We believe the type of question asked by the trial court in this case is exactly what the Court in *Brasfield* implicitly approved when it stated: "[An inquiry as to numerical division] serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division." *Ibid.*

We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion. *United States Gypsum Co.*, *supra*, at 462. We note, however, that defense counsel did not object to either the polls or the supplemental instruction. We do not suggest that petitioner thereby waived this issue, *Wainwright* v. *Witt*, 469 U. S. 412, 431, n. 11 (1985), but we think such an omission indicates that the potential for coercion argued now was not apparent to one on the spot.[4] *Id.*, at 430–431, and n. 11.

---

[3] Our decision in *Brasfield* makes no mention of the Due Process Clause or any other constitutional provision. The Federal Courts of Appeals have uniformly rejected the notion that *Brasfield*'s *per se* reversal approach must be followed when reviewing state proceedings on habeas corpus. *E. g.*, *Williams* v. *Parke*, 741 F. 2d 847, 851 (CA6 1984), cert. denied, 470 U. S. 1029 (1985); *Locks* v. *Sumner*, 703 F. 2d 403, 405–407 (CA9), cert. denied, 464 U. S. 933 (1983).

[4] The mistrial motions referred to by the dissent, *post*, at 254, n. 3, were unrelated to the actions of the trial court—the polls and the supplemental

We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny petitioner any constitutional right. By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body. For the reasons stated we hold there was no coercion here.

### III

Petitioner advances as a second ground for vacating his sentence of death that the sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime of which he was convicted. Petitioner urges that this overlap left the jury at the sentencing phase free merely to repeat one of its findings in the guilt phase, and thus not to narrow further in the sentencing phase the class of death-eligible murderers. Upon consideration of the Louisiana capital punishment scheme in the light of the decisions of this Court we reject this argument.

Louisiana has established five grades of homicide: first-degree murder, second-degree murder, manslaughter, negligent homicide, and vehicular homicide. La. Rev. Stat. Ann. § 14:29 (West 1986). Second-degree murder includes intentional murder and felony murder, and provides for punishment of life imprisonment without the possibility of parole. § 14:30.1.[5] Louisiana defines first-degree murder to include a narrower class of homicides:

---

instruction—that now form the core of petitioner's argument and the dissent's attack, and there is no reason defense counsel would have been dissuaded from objecting to these latter actions because of the unsuccessful mistrial motions.

[5] "Second degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, ag-

"First degree murder is the killing of a human being:

"(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;

"(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman or peace officer engaged in the performance of his lawful duties;

"(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or

"(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.

"(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years."  § 14:30A.

An individual found guilty of first-degree murder is sentenced by the same jury in a separate proceeding to either death or life imprisonment without benefit of parole, probation, or suspension of sentence.  § 14:30C.  "A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed."  La. Code Crim. Proc. Ann., Art. 905.3 (West 1984). Louisiana has established 10 statutory aggravating circum-

---

gravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm." La. Rev. Stat. Ann. § 14:30.1 (West 1986).

stances. Art. 905.4.[6] If the jury returns a sentence of death, the sentence is automatically reviewable for excessiveness by the Supreme Court of Louisiana. Art. 905.9.

Petitioner was found guilty of three counts of first-degree murder under § 14.30.A.(3): "[T]he offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The sole aggravating circumstance both found by the jury and upheld by the Louisiana Supreme Court was that "the offender knowingly created a risk of death or great bodily harm to more than one person." Art. 905.4(d). In these circumstances, these two provisions are interpreted in

---

[6] "The following shall be considered aggravating circumstances:

"(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery;

"(b) the victim was a fireman or peace officer engaged in his lawful duties;

"(c) the offender was previously convicted of an unrelated murder, aggravated rape, or aggravated kidnapping or has a significant prior history of criminal activity;

"(d) the offender knowingly created a risk of death or great bodily harm to more than one person;

"(e) the offender offered or has been offered or has given or received anything of value for the commission of the offense;

"(f) the offender at the time of the commission of the offense was imprisoned after sentence for the commission of an unrelated forcible felony;

"(g) the offense was committed in an especially heinous, atrocious, or cruel manner; or

"(h) the victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.

"(i) the victim was a correctional officer or any other employee of the Louisiana Department of Corrections who, in the normal course of his employment was required to come in close contact with persons incarcerated in a state prison facility, and the victim was engaged in his lawful duties at the time of the offense." La. Code Crim. Proc. Ann., Art. 905.4 (West 1984).

a "parallel fashion" under Louisiana law. See *State* v. *Williams*, 480 So. 2d 721, 726–727 (La. 1985). Petitioner's argument that the parallel nature of these provisions requires that his sentences be set aside rests on a mistaken premise as to the necessary role of aggravating circumstances.

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant* v. *Stephens*, 462 U. S. 862, 877 (1983); cf. *Gregg* v. *Georgia*, 428 U. S. 153 (1976). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. *Id.*, at 162–164 (reviewing Georgia sentencing scheme); *Proffitt* v. *Florida*, 428 U. S. 242, 247–250 (1976) (reviewing Florida sentencing scheme). By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Zant, supra,* at 878 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty").

In *Zant* v. *Stephens, supra,* we upheld a sentence of death imposed pursuant to the Georgia capital sentencing statute, under which "the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." *Id.*, at 874. We found no constitutional deficiency in that scheme because the aggravating circumstances did all that the Constitution requires.

The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be

performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in *Jurek* v. *Texas*, 428 U. S. 262 (1976), establishes this point. The *Jurek* Court upheld the Texas death penalty statute, which, like the Louisiana statute, narrowly defined the categories of murders for which a death sentence could be imposed. If the jury found the defendant guilty of such a murder, it was required to impose death so long as it found beyond a reasonable doubt that the defendant's acts were deliberate, the defendant would probably constitute a continuing threat to society, and, if raised by the evidence, the defendant's acts were an unreasonable response to the victim's provocation. *Id.*, at 269. We concluded that the latter three elements allowed the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provided for jury discretion. *Id.*, at 271–274. But the opinion announcing the judgment noted the difference between the Texas scheme, on the one hand, and the Georgia and Florida schemes discussed in the cases of *Gregg, supra,* and *Proffitt, supra:*

> "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose. . . . In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their statutory aggravating circumstances. . . . Thus, in essence, the Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option—even potentially—for

a smaller class of murders in Texas." 428 U. S., at 270–271 (citations omitted).

It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. See also *Zant, supra,* at 876, n. 13, discussing *Jurek* and concluding: "[I]n Texas, aggravating and mitigating circumstances were not considered at the same stage of the criminal prosecution."

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

The judgment of the Court of Appeals for the Fifth Circuit is accordingly

*Affirmed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, and JUSTICE STEVENS joins as to Part I, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the

Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 231–241 (1976) (MARSHALL, J., dissenting), I would vacate the decision below insofar as it left undisturbed the death sentence imposed in this case.

Even if I did not hold this view, I would vacate petitioner's sentence of death for two independent reasons. First, the jury that sentenced Leslie Lowenfield was subjected during the penalty phase of the trial to a combination of practices that courts have viewed as coercive in far less sensitive situations. The use of these practices in this case presents an unacceptable risk that the jury returned a sentence of death for reasons having nothing to do with proper constitutional considerations. Second, even in the absence of coercion, the jury's sentence of death could not stand because it was based on a single statutory aggravating circumstance that duplicated an element of petitioner's underlying offense. This duplication prevented Louisiana's sentencing scheme from adequately guiding the discretion of the sentencing jury in this case and relieved the jury of the requisite sense of responsibility for its sentencing decision. As we have recognized frequently in the past, such failings may have the effect of impermissibly biasing the sentencing process in favor of death in violation of the Eighth and the Fourteenth Amendments.

## I

After many hours of deliberations, petitioner's sentencing jury informed the court that it was "having great distress" and unable to reach a verdict. App. 17. Had the jury remained deadlocked, petitioner would have received a sentence of life imprisonment by the operation of Louisiana law. But the presiding judge intervened to aid the jury in reaching a verdict, and petitioner now charges that the judge's intervention was coercive.

Two principles should guide our evaluation of petitioner's claim. First, recognizing that "impartiality" is a state difficult to define and "coercion" an event difficult to discern in concrete situations, we must be careful to focus on the par-

ticular facts of this case in order to assess "all the circumstances" surrounding the jury's progress from deadlock to unanimity. *Jenkins* v. *United States*, 380 U. S. 445, 446 (1965) *(per curiam)*. Second, we often have acknowledged that the unique nature of the death penalty demands a greater degree of reliability in capital sentencings than in other criminal proceedings. See, *e. g.*, *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (opinion of Burger, C. J., joined by Stewart, Powell, and STEVENS, JJ.); *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.).

The Court in this case pays mere lipservice to these concerns, citing the relevant portions of *Jenkins* and *Lockett* but then proceeding to ignore their teachings. The Court offers a sanitized rendition of the facts, ignoring or glossing over evidence of coercion in its examination of "all the circumstances" of the sentencing proceeding. The Court then performs a mechanical and cramped application of our precedents regarding jury coercion, essentially restricting these cases to their facts. Moreover, the Court focuses on the impact of each challenged practice in isolation, never addressing their cumulative effect. Finally, the Court neglects to consider how the capital sentencing context of this case affects the application of principles forged in other contexts. In sum, the Court's approach fails to take seriously petitioner's challenge and consequently fails to recognize its force. The Court's decision to condone the coercive practices at issue here renders hollow our pronouncement that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 521–522, n. 20 (1968).

The starting point for any determination of jury coercion is the facts of a given case. The opinion of the Court, however, does not keep its promise to examine "all the circumstances," failing to mention several significant events in evaluating whether the trial court's conduct improperly influenced the

jury's decision. First, the Court treats as irrelevant all events preceding the polling of the jury and the administration of the *Allen* charge. *Allen* v. *United States*, 164 U. S. 492 (1896). The Court fails to recognize that the guilt phase of petitioner's trial, which immediately preceded the sentencing phase, shaped the jury's collective state of mind and relationship to the court. The jury's deliberations on the issue of guilt or innocence lasted 13 hours over 2 days. After 11 hours of deliberation, the jury informed the court that it was experiencing "much distress" and requested to view some physical evidence. App. 16. The court refused the request and stated: *"I order you* to go back to the jury room and to deliberate and *arrive at a verdict." Id.*, at 24 (emphasis added). Defense counsel objected to this instruction and raised that objection again during the penalty phase on the ground that it might have a "residual effect" on the sentencing process. *Id.*, at 51. After the jury returned its guilt phase verdict at 3 p.m., the court gave the jury only an hour's break before conducting the sentencing hearing and sending the jury to deliberate at 8:17 p.m. These events might well have suggested to the jury that the court was anxious for a verdict to be reached and reached quickly. That impression might have received further support when, at 11:55 p.m. and after a total of more than 13 hours that day in court, the jury requested permission to retire for the night, and the court inquired: "Is there any way you could continue deliberating tonight and arrive at a verdict?" *Id.*, at 48. This background, which the Court ignores, is important to an understanding and evaluation of the jury's reaction to the polling procedures and the modified *Allen* charge of the following day.

Second, although the Court notes that the jury was instructed at the commencement of the sentencing phase that its failure to reach a verdict would result in a life sentence rather than a second sentencing hearing, the Court fails to observe that this instruction was repeated three more times

during the proceeding. First, the jury sent a note specifically asking whether a life sentence would result automatically from a failure to reach a verdict, to which the court responded affirmatively. Second, the court repeated this instruction before polling the jury as to whether further deliberations would be helpful. Finally, the court repeated it again immediately after twice polling the jury and immediately before giving the modified *Allen* charge. The court's reiteration of the consequences of failing to reach a verdict before the jury poll and again before the verdict-urging charge may well have been understood by the jury as an expression by the court of reluctance to impose only a life sentence and an admonition to reach a verdict.

Third, the Court does not mention the refusal of defense counsel's specific request that the jury be instructed that it was not required by law to return a verdict. In *Hyde* v. *United States*, 225 U. S. 347 (1912), we rejected a claim of jury coercion by relying on the court's statement to the jurors that if " 'they could not conscientiously and freely agree upon a verdict they would be discharged.' " *Id.*, at 382. We concluded that "[i]t is hard to believe that . . . with that promise expressly made to them, they were coerced by a threat of confinement to acquit those who they were convinced were guilty or convict those who they were convinced were innocent." *Id.*, at 383. In the decided absence of such an instruction, the possibility of coercion runs much stronger.

None of the above circumstances is by itself a reason to conclude that the jury was coerced in this case. But these circumstances, as well as those recounted by the Court, make up the "totality" in light of which we must judge the practices challenged in this case. Both the polling procedures and the *Allen* charge administered by the court must be examined against this background, first individually and then as a cumulative whole.

The Court makes quick work of petitioner's challenge to the court's polling of the jury in this case. Observing that

the court's inquiries regarding the helpfulness of further deliberations were "clearly independent" of an inquiry regarding the jury's stance on the merits, the Court concludes that the pollings of the jury did not "'reveal the nature or extent of its division.'" *Ante*, at 240 (quoting *Brasfield* v. *United States*, 272 U. S. 448, 450 (1926)). Such a conclusion might be accurate in an ordinary trial setting, where a hung jury leads only to retrial. But the Court ignores the fact that the jury in this case had been instructed repeatedly that failure to reach a verdict would automatically result in a life sentence. With this background knowledge, a juror's vote against further deliberations indicated acceptance of the life sentence that would necessarily follow. The jury's response to the polling questions in this case thus very probably revealed the nature and extent of its substantive division.

Not only does the Court refuse to acknowledge that the polling in this case is similar in nature to the polling we condemned in *Brasfield,* it also ignores the ways in which this case is worse than *Brasfield.* The court here polled the jury not once, but twice, increasing whatever coercive effect a single poll would have had. Moreover, the second poll whittled down the minority jurors from 4 to 1, creating enormous pressure on the lone holdout, as compared to the minority of three jurors in *Brasfield.* Finally, the jurors in this case were asked to identify themselves by name in both polls, exposing the identities of the minority jurors to the court. Under such circumstances, the polling procedures used here posed an even greater risk of "improper influence upon the jury" than the poll we examined and rejected in *Brasfield. Id.*, at 450.

The Court's treatment of petitioner's challenge to the *Allen* charge is similarly dismissive. The Court begins by suggesting that the validity of such charges is "beyond dispute," citing cases from all of the Circuits in which some form of an *Allen* charge has been upheld. *Ante*, at 237–238, and n. 1. This sweeping statement denigrates the serious res-

ervations expressed by many federal[1] and state[2] courts concerning the coercive nature of the traditional *Allen* charge. These reservations, voiced in the context of ordinary criminal trials, have particular significance for the instant case.   The usual justifications for a verdict-urging charge are the time, expense, and possible loss of evidence that a new trial would entail.   None of these justifications was present here, where a hung jury would have resulted in a life sentence.   Moreover, in an ordinary criminal trial, an *Allen* charge will not steer the jury one way or the other on the merits, because it is as likely that the minority jurors are for conviction as for acquittal.   Here, the charge inevitably made a verdict of death more likely, because a continued deadlock would have achieved a substantive outcome of a life sentence rather than simply another sentencing hearing.   These considerations indicate that the State's interest in a verdict in this case was relatively weak, whereas the defendant's interest in preserving the integrity of a dissenting vote was correspondingly strong.   The general reservations voiced by other courts

---

[1] See, *e. g., United States* v. *Rey,* 811 F. 2d 1453, 1458, 1460 (CA11) ("The modern judicial trend . . . is against the Allen charge. . . . As we see it, the Allen charge interferes with the jurors when they are performing their most important role: determining guilt or innocence in a close case. It unjustifiably increases the risk that an *innocent* person will be convicted as a result of the juror abandoning his honestly-held beliefs"), cert. denied, 484 U. S. 830 (1987); *United States* v. *Blandin,* 784 F. 2d 1048, 1050 (CA10 1986) ("We have approved the *Allen* instruction as permissible in the Tenth Circuit, but urge caution in its use. . . . It should not be given during the course of deliberations"); *United States* v. *Seawell,* 550 F. 2d 1159, 1162, 1163 (CA9 1977) ("Problems arising from the inherently coercive effect of the *Allen* charge have caused other courts of appeals and state courts to prohibit or to restrict severely its use. . . . A single *Allen* charge, without more, stands at the brink of impermissible coercion") (footnotes omitted).

[2] See, *e. g., People* v. *Gainer,* 19 Cal. 3d 835, 566 P. 2d 997 (1977) (banning use of traditional *Allen* charge in all criminal cases); *State* v. *Czachor,* 82 N. J. 392, 413 A. 2d 593 (1980) (same); *Kersey* v. *State,* 525 S. W. 2d 139 (Tenn. 1975) (same).

about the coerciveness of verdict-urging charges should be given special attention under these circumstances.

The opinion of the Court, however, persistently refuses to recognize the unique posture of this case. Instead, it blandly notes that this case is factually distinguishable from our other significant jury coercion cases, *Jenkins* v. *United States*, 380 U. S. 445 (1965), and *United States* v. *United States Gypsum Co.*, 438 U. S. 422 (1978). This analysis, if such it may be called, fails to recognize the animating principle of both *Jenkins* and *Gypsum:* If the jury might believe from the trial court's statements or actions that the court is insisting upon a verdict "'one way or the other,'" 438 U. S., at 460, that message poses an impermissible risk of jury coercion. Just such a risk was posed here, when the court gave a verdict-urging charge to a jury that knew, and indeed had just been instructed, that its failure to reach unanimity would result in the substantive outcome of a life sentence.

The Court's most significant analytical failure, however, lies in its refusal to consider petitioner's charge of coercion in other than a piecemeal fashion. Content that the polling procedures did not contravene *Brasfield* and that the verdict-urging charge satisfied *Allen*, the Court never considers the two practices in tandem. Other federal courts have recognized that an *Allen* charge given on the heels of a jury poll poses special risks of coercion. See *United States* v. *Sae-Chua*, 725 F. 2d 530, 532 (CA9 1984); *Cornell* v. *Iowa*, 628 F. 2d 1044, 1048, n. 2 (CA8 1980), cert. denied, 449 U. S. 1126 (1981); *Williams* v. *United States*, 119 U. S. App. D. C. 190, 193, 338 F. 2d 530, 533 (1964). These courts have noted that when a jury poll is followed by an *Allen* charge, "the impression is inherently conveyed to the jury that the revelation of their division prompted the giving of the subsequent verdict-urging instruction and that it is, therefore, directed toward the minority jurors." *Cornell* v. *Iowa, supra,* at 1048, n. 2. In this case, the charge was given after the polling had pared down the minority to a single juror, identified

to the court by name.   That juror could not help feeling that the verdict-urging charge was directed at him and him alone. The polling and the charge in this case together created an atmosphere far more charged with coercion than either practice alone possibly could have engendered.   Such coercion is strongly evidenced by the fact that the jury returned a verdict of death a mere 30 minutes after the court gave the verdict-urging charge.[3]

It is an open and a far closer question whether the practices challenged in this case should be deemed coercive in an ordinary criminal context.   We have recognized often and reiterated last Term that practices entirely appropriate in other contexts may be improper in capital sentencing proceedings.   See *Booth* v. *Maryland*, 482 U. S. 496, 509, n. 12 (1987).   The Court in this case, however, fails to recognize this principle and makes no attempt to assess how the capital sentencing context affects the legitimacy of the challenged practices.   This failure is troubling not only because we require greater reliability in capital sentencings, but also because the nature of the capital sentencing process makes the practices challenged here more dangerous.   The capital sentencing jury is asked to make a moral decision about whether a particular individual should live or die.   Despite the objective factors that are introduced in an attempt to guide the exercise of the jurors' discretion, theirs is largely a sub-

---

[3] The Court argues that the failure of petitioner's counsel to object to the polling or the *Allen* charge suggests that their coercive potential was not "apparent." *Ante,* at 240.   The Court fails to acknowledge, however, that at the time of the polling and charge, defense counsel had already moved three separate times for a mistrial during the sentencing phase: once when the jury had been out for more than five hours, again when the jury sent a note indicating its deadlock, and again after the first polling revealed an 8-to-4 division as to whether further deliberations would be helpful.   Defense counsel may well have reasoned that renewing his motions during the second polling or the *Allen* charge would be unavailing. In any case, counsel's repeated mistrial motions clearly demonstrate his awareness of the jury's confusion and distress.

jective judgment. Given the amorphous and volatile nature of their inquiry, capital sentencing juries that have reached an impasse in their deliberations may be particularly prone to coercion from the court. This concern leads me to conclude that the jury polling and *Allen* charge used in this case created an unacceptable risk of jury coercion and thus were "inconsistent with the reasoned decisionmaking we require in capital cases." *Booth* v. *Maryland, supra,* at 509 (footnote omitted).

## II

Even had the jury reached its verdict free from any improper influence by the court, that verdict still could not stand. The principles established by our prior cases preclude the imposition of the death penalty when it is based on a single statutory aggravating circumstance that merely duplicates an element of the underlying offense. We have insisted repeatedly that the discretion of the sentencer be guided by a narrowing of the class of people eligible for the death penalty and that the sentencer be fully cognizant of its responsibility for the imposition of a sentence of life or death. Both of these principles have been violated by the operation of the Louisiana sentencing scheme in this case.

Since our decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972), we have required that there be a "meaningful basis for distinguishing the few cases in which [the death sentence] is imposed from the many cases in which it is not." *Id.,* at 313 (WHITE, J., concurring). We have held consistently that statutory aggravating circumstances considered during the sentencing process provide one of the means by which the jury's discretion is guided in making such constitutionally mandated distinctions. See, *e. g., McCleskey* v. *Kemp,* 481 U. S. 279, 305 (1987) (describing "the role of the aggravating circumstance in guiding the sentencing jury's discretion"); *Zant* v. *Stephens,* 462 U. S. 862, 877 (1983) (holding that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty"); *Gregg*

v. *Georgia,* 428 U. S., at 197 (opinion of Stewart, Powell, and STEVENS, JJ.) (explaining that the finding of statutory aggravating circumstances helps the jury "to consider the circumstances of the crime and the criminal before it recommends sentence").

The Court today suggests that our emphasis on aggravating circumstances has been mere happenstance and holds that the critical narrowing function may be performed prior to and distinct from the sentencing process.[4] This holding misunderstands the significance of the narrowing requirement. The Court treats the narrowing function as a merely technical requirement that the number of those eligible for

---

[4] The Court argues that our opinion in *Jurek* v. *Texas,* 428 U. S. 262 (1976), establishes that the narrowing requirement may constitutionally be met at the guilt phase rather than the sentencing phase. It focuses on dicta in the opinion announcing the judgment to the effect that the classes of capital murder established by the Texas Legislature serve "'much the same purpose'" as a list of statutory aggravating circumstances. *Ante,* at 245 (quoting *Jurek* v. *Texas, supra,* at 270 (opinion of Stewart, Powell, and STEVENS, JJ.)). The Court ignores our later recognition that the three questions posed to the jury during the sentencing phase under the scheme approved in *Jurek* establish additional aggravating circumstances not already determined during the guilt phase. See, *e. g., Skipper* v. *South Carolina,* 476 U. S. 1, 5 (1986) ("[E]vidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an 'aggravating factor' for purposes of capital sentencing"); *Adams* v. *Texas,* 448 U. S. 38, 46 (1980) (In answering the three sentencing questions affirmatively, jurors in Texas "must consider both aggravating and mitigating circumstances, whether appearing in the evidence presented at the trial on guilt or innocence or during the sentencing proceedings"). Hence, *Jurek* cannot establish our approval of a divorce of the narrowing requirement from the sentencing proceedings.

Moreover, even if *Jurek* did stand for the proposition advanced by the Court, it would still be distinguishable from the instant case. Under the Texas capital sentencing statute evaluated in *Jurek,* jurors are explicitly instructed at the guilt phase that their findings would make the defendant eligible for the death penalty. See *Jurek* v. *State,* 522 S. W. 2d 934, 938 (Tex. Crim. App. 1975). In the instant case, the jurors were specifically instructed *not* to consider the penalty that might result from their findings during the guilt phase. See Record 2283.

the death penalty be made smaller than the number of those convicted of murder. But narrowing the class of death eligible offenders is not "an end in itself" any more than aggravating circumstances are. See *ante*, at 244. Rather, as our cases have emphasized consistently, the narrowing requirement is meant to channel the discretion of the sentencer. It forces the capital sentencing jury to approach its task in a structured, step-by-step way, first determining whether a defendant is eligible for the death penalty and then determining whether all of the circumstances justify its imposition. The only conceivable reason for making narrowing a constitutional requirement is its function in structuring sentencing deliberations. By permitting the removal of the narrowing function from the sentencing process altogether, the Court reduces it to a mechanical formality entirely unrelated to the choice between life and death.

The Court's relegation of the narrowing function to the guilt phase of a capital trial implicates the concerns we expressed in another context in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985). In *Caldwell*, we vacated petitioner's sentence of death when the prosecutor had argued to the jury that the appellate court would review the imposition of the death sentence for correctness, concluding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsiblity for determining the appropriateness of the defendant's death rests elsewhere." *Id.*, at 328–329. Here, the sentencing jurors were led to believe that petitioner's eligibility for the death sentence was already established by their findings during the guilt phase—findings arrived at without any contemplation of their implication for petitioner's sentence. Indeed, the court specifically instructed the jury at the start of its guilt phase deliberations: "You are not to discuss, in any way, the possibility of any penalties whatsoever." Record 2283. Then, during the penalty hearing, the prosecutor twice reminded the jury that

it had already found during the guilt phase one of the aggravating circumstances that the State urged was applicable to petitioner's sentence. *Id.*, at 2311, 2319. The prosecutor's argument might well have convinced the jury that it had no choice about and hence no responsibility for the defendant's eligibilty for the death penalty. This situation cannot be squared with our promise to ensure that "a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Caldwell* v. *Mississippi, supra,* at 341.

In sum, the application of the Louisiana sentencing scheme in cases like this one, where there is a complete overlap between aggravating circumstances found at the sentencing phase and elements of the offense previously found at the guilt phase, violates constitutional principles in ways that will inevitably tilt the sentencing scales toward the imposition of the death penalty. The State will have an easier time convincing a jury beyond a reasonable doubt to find a necessary element of a capital offense at the guilt phase of a trial if the jury is unaware that such a finding will make the defendant eligible for the death penalty at the sentencing phase. Then the State will have an even easier time arguing for the imposition of the death penalty, because it can remind the jury at the sentencing phase, as it did in this case, that the necessary aggravating circumstances already have been established beyond a reasonable doubt. The State thus enters the sentencing hearing with the jury already across the threshold of death eligibility, without any awareness on the jury's part that it had crossed that line. By permitting such proceedings in a capital case, the Court ignores our early pronouncement that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon* v. *Illinois,* 391 U. S., at 521 (footnote omitted).

## III

After a total of 22 hours of almost continuous deliberations regarding petitioner's guilt and appropriate sentence, the jury in this case informed the court that it was in "great distress." Had the jury not broken its deadlock, petitioner would have been entitled to a life sentence without retrial. Thus, at 3 p.m. on May 16, 1984, Leslie Lowenfield's life hung delicately in the balance. It is impossible to know what finally prompted the jury to return its sentence of death, but the coercive practices engaged in by the trial court, or the prosecutor's argument that a key aggravating circumstance already had been established at the guilt phase, may well have tipped the balance. Neither of these factors has any place in capital sentencing deliberations, and their presence in this case convinces me that petitioner was denied the individualized and reasoned consideration of his penalty that the Constitution promises him. I dissent.