Ex Parte Scott Louis PANETTI,
Applicant.

No. WR–37,145–03.

Court of Criminal Appeals of Texas.

Dec. 15, 2010.

Gregory W. Wiercioch, San Francisco, for Appellant.

E. Bruce Curry, D.A., Kerrville, Lisa C. McMinn, State's Atty., Austin, for State.

### ORDER

PER CURIAM.

This is a subsequent application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071, § 5.

Applicant was convicted September 1995 of the offense of capital murder. The jury answered the special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure, and the trial court, accordingly, set punishment at death. This Court affirmed Applicant's conviction and sentence on direct appeal. *Panetti v. State*, No. 72,230 (Tex.Crim.App. Dec. 3, 1997) (not designated for publication). This Court denied Applicant's initial post-conviction application for writ of habeas corpus. *Ex parte Panetti*, No. WR–37,-145–01 (Tex. Crim App. May 28, 1998) (not designated for publication). This Court dismissed Applicant's first subsequent application for writ of habeas corpus. *Ex parte Panetti*, No. WR–37,145–02, 2009 WL 3368707 (Tex.Crim.App. Oct. 21, 2009) (not designated for publication). Applicant's instant post-conviction application

for writ of habeas corpus was received in this Court on October 20, 2010. Applicant presents two allegations.

Applicant's claims fail to meet the dictates of Article 11.071, § 5. Accordingly, we dismiss his application.

IT IS SO ORDERED.

JOHNSON and HOLCOMB, JJ., would grant.

HOLCOMB, J., wrote a dissenting statement which JOHNSON, J., joined.

HOLCOMB, J., filed a dissenting statement, in which JOHNSON, J., joined.

In *Indiana v. Edwards*, 554 U.S. 164, 177–78, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), the United States Supreme Court first recognized a mental-illness-related limitation on a defendant's Sixth Amendment right to self-representation:

"[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."

Given the Supreme Court's decision in *Indiana v. Edwards*, I would file and set Scott Louis Panetti's first subsequent application for writ of habeas corpus in order to consider his claim that the trial court violated the Eighth Amendment when it allowed him, though severely mentally ill, to represent himself at his capital murder trial.

In September 1992, Panetti shot and killed his in-laws, Joe and Amanda Alvarado, during a single criminal transaction. Soon thereafter a Gillespie County grand jury returned an indictment charging Panetti with the capital murder of the Alvarados under Texas Penal Code § 19.03(a)(7)(A). In September 1994, the trial court, at defense counsel's request, impaneled a jury to determine whether Panetti was competent to stand trial under the indictment. At that competency hearing, two witnesses testified for the defense. The first witness, Richard Mosty, was one of Panetti's defense counsel.

"Mosty testified that the court appointed him to represent [Panetti] in September 1992. He stated that during this two year period he had no useful communication with [Panetti] regarding case proceedings, [Panetti's] thought processes were bizarre, and [Panetti] had multiple personalities. Mosty further stated that when [Panetti] was in a stable environment, [he] became better at communicating on a basic level. However, when [Panetti] entered a stressful environment such as the courtroom or switching jails, [he] would again become delusional. Finally, Mosty testified that [Panetti] had been the best Mosty had ever seen in the few days preceding the [competency] hearing. Nevertheless, [Panetti] would still 'blank out' when counsel tried to discuss the case." *Panetti v. State,* No. 72,230 (Tex.Crim.App.-Dec. 3, 1997), slip. op. at 22–23 (not designated for publication).

The second witness for the defense was Dr. Richard Coons, a psychiatrist.

"Coons examined [Panetti] on five occasions from March 1993 through September 1994. Coons concluded [Panetti]

tended to decompensate[1] and his thinking became inefficient when under stress. He described [Panetti's] thought process as 'tangential,' meaning [he] would go off on tangents and never return to the original subject being discussed. Coons further noted [Panetti] had been diagnosed as a schizophrenic and had been in and out of various State and V.A. [Veterans Administration] hospitals since 1981. After concluding [Panetti] was not competent to stand trial, Coons noted that schizophrenia can be controlled and felt [Panetti] should be hospitalized in order to receive the proper medications." *Id.* at 23.

Another psychiatrist, Dr. Lee Simes, testified for the State.

"Simes concluded [Panetti] was mentally ill and agreed with [Panetti's] previous diagnosis as a schizophrenic. He noted [Panetti] was very concerned about what medication he might be able to get after the hearing and equated the hearing to a chess game between two doctors. Simes further admitted [Panetti] had delusional thinking which could interfere with [his] communications with his attorneys. However, Simes stated that as of his final evaluation one day before the instant hearing, [Panetti] was competent to stand trial." *Id.* at 24–25.

At the conclusion of the competency hearing, the jury found Panetti competent to stand trial. Sometime thereafter Panetti asked the trial court to dismiss his two court-appointed counsel and allow him to represent himself. The trial court, acting under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), a non-capital case, admonished Panetti regarding the nature of his right to counsel

---

1. Our opinion on direct appeal did not explain what "decompensate" meant in this context.

and the many disadvantages of waiving that right, especially in a capital case.[2] The trial court also informed Panetti that it would prefer that he not waive his right to counsel. The State and defense counsel also stated that they preferred that Panetti not waive his right to counsel. Nevertheless, Panetti insisted on representing himself. At that point, the trial court,

under *Faretta,* had no choice but to grant Panetti's request, and so it did. The court appointed standby counsel in an order that strictly limited him to procedural advice.[3]

At the guilt stage of trial, Panetti pled not guilty by reason of insanity. In support of that defense, Panetti presented numerous witnesses, including himself.[4]

**2.** In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), a noncapital case, the Supreme Court held that an accused has a Sixth Amendment right to conduct his own defense. To proceed *pro se,* a defendant must voluntarily and intelligently waive the right to counsel. *Id.* at 835, 95 S.Ct. 2525. To ensure a valid waiver, the trial court must ensure that the defendant is aware of the dangers and disadvantages of self-representation. *Ibid.*

**3.** The trial court's order to standby counsel read, in relevant part, as follows:

"1. Unless otherwise requested by the Defendant, standby counsel is to be seen and not heard.
"2. Standby counsel is not to sit at the counsel table with Defendant unless Defendant asks him to do so.
"3. Standby counsel, when requested by the Defendant, may advise Defendant on procedural matters only. Standby counsel shall not, at any time, advise Defendant on any substantive matters, even if requested to do so by Defendant.
"4. Standby counsel may not participate in any part of the trial process unless specifically requested to do so by the Defendant, and then only on procedural matters by way of giving advice to the Defendant.
"5. Standby counsel shall not question any prospective jurors nor make any suggestions or offer advice as to which prospective jurors might be favorable to the Defendant or Prosecution.
"6. Standby counsel shall not exercise any peremptory challenges or challenges for cause on any prospective jurors.
"7. Standby counsel shall not advise Defendant as to any particular areas of inquiry during voir dire.
"8. Standby counsel shall not make any objections unless requested to do so by the Defendant.

"9. Standby counsel shall not make any motions for mistrial unless requested to do so by the Defendant.
"10. Standby counsel shall not advise Defendant of any procedural irregularities, either by the State or by the Defendant, unless requested to do so by the Defendant.
"11. Standby counsel shall not volunteer any procedural assistance to Defendant.
"12. Standby counsel shall not do any other act or take any other action, which in the opinion of either standby counsel or the Defendant, would in any way interfere with or affect the right of the Defendant to represent himself."

**4.** Panetti's standby counsel at trial has filed an affidavit in this case, which reads, in part, as follows:

"[Scott Panetti's] incompetence affected his case. Bruce Curry, the DA, had put Scott's ex-wife, Sonja Alvarado on the stand on the first day of testimony. She was the first witness. It was her parents that Scott had killed. After Scott's bizarre questions and actions to Sonja, the Jury was ready to give him the death penalty. Scott angered the Jury by his demeanor and actions. I tried to advise Scott on the method of questioning his ex-wife, but he did not listen. I told him not to go over the shooting and other details of the family that were not relevant. It did no good to advise Scott.
"Scott was repeating questions. He was splitting hairs with the witnesses on the confession. Scott was calling witnesses that had nothing to do with insanity. Scott was really upset over the release of [State's witness] Dr. Simes. Judge Ables had warned Scott that Dr. Simes would not be available and to call him since he was present. Scott said he did not understand what the Judge had told him and he was confused.
"When Scott testified, it looked like he went into a trance. Scott was sitting in the

"[Panetti] testified [that] when he awoke on the morning of [the offense], his alternate personality, 'Sergeant Ironhorse' or 'Sarge,' had control. It was Sarge who decided to shave his head, dress in military attire, and gather weapons [with which to commit the offense]. [Panetti] claimed he could remember everything Sarge did, even though Sarge is a different personality. He further claimed he argued with Sarge about what Sarge was doing, but Sarge won.

\*      \*      \*

witness chair with [Texas] Ranger Cleat Buckelew between him and the Jury. Scott had his head down, not looking at the Jurors although he was seated directly by them. Scott recalled in his trance-like state, the details of the shooting, reciting what happened in the third person as a dialogue. Scott said, 'Sarge ran into the room. What was Sarge doing? Where is Birdie?' Scott was pointing his hand out across the jury box like he was shooting as he recited, 'Boom, Boom, Boom.' Scott's head was down as he spoke while he pointed at the jury with his booms. He could not see the reaction of the Jury. The Jury was visibly upset by the pointing demonstration. I had seen the Jurors who were sitting closest to Scott, move away when he sat down. Now he was blindly pointing at the panel while he spoke of 'Sarge shooting Joe and Amanda Alvarado.' This was a show of a mentally incompetent man and did more to give him the death penalty than any other event in trial.

"This was not a case for the death penalty. Scott's life history had long term mental problems and made an excellent case for mitigating evidence. Scott did not present any mitigating evidence because he did not understand the proceeding. He obviously thought that this courtroom 'show' would be enough. Although many friends and family were available to testify, Scott only called me at punishment to rebut a statement that Dep. Gideon made about Scott. I tried to make Scott realize what mitigation meant. I do not think that he understood the concept or how to present evi-

"Richard Mosty, [Panetti's] former trial counsel, testified that [Panetti's] mental health records reflected the following: committed in 1981 at Kerrville State Hospital for dependent personality disorder; committed in 1986 at Starlight Village Hospital for schizophrenia, delusions, disorientation as to time and place, seriously-impaired judgment, hostility, psychosis, and trying to 'extract' the Devil from his home by taking his furniture outside and spraying it with water; treatment at the Waco Veterans Administration Hospital; treatment at Tomah Hospital in Wisconsin in 1986;

dence or argue for mitigation in his own case. In my opinion, there was much to present, but he was mentally incapable of showing the evidence.

\*      \*      \*

"Scott dressed in a 'Tom Mix' style costume like an old TV western. Scott wore his hat in Court. He had pants that looked like leather suede tucked into his cowboy boots. He wore a cowboy style shirt with a bandana. The shirt was the double fold over type western shirt. One shirt was a green color, the other was burgundy. Scott wore a big cowboy hat that hung on a string over his back. It was a joke. It was like out of a dime store novel. Scott constantly used an old west vernacular in his speech. He used words like 'bronc steer,' 'run away mule,' and 'shoe the bosses' hosses.'

\*      \*      \*

"Scott was not able to represent himself due to his mental incompetence. His bizarre actions and words affected witnesses and the Jury. Scott was not able to rationally understand his death penalty trial. I believe that his incompetence brought him the death penalty. In simple terms, by representing himself he hung himself. Scott's incompetence prevented him from asking for or using my assistance as his standby. I was not able to assist Scott in any meaningful way because he was so mentally incompetent. As a result, his trial was truly a judicial farce, and a mockery of self-representation. It should have never been allowed to happen, or, at least, stopped."

recommitted to Kerrville State Hospital in 1990 for threatening to kill [his] wife, baby, father-in-law, and self and starting to use the name Sergeant Ironhorse.

"Marcie Panetti, [Panetti's] sister-in-law, testified she met [Panetti] about fifteen years before and knew immediately [he] was mentally ill. She did not see him again until the trial, but did speak to him on the phone a few months before her instant testimony. She stated that it was obvious he was mentally ill by the way he rambled and talked constantly.

"Dr. John Ramsey, [Panetti's] former family physician, testified he had seen [Panetti] several times for psychiatric problems. He stated that in 1984 and 1985 [Panetti] began to come into the office becoming more demanding, rambling, and clearly suffering from a manic depressive illness exhibiting extreme ideas and grand schemes. To Dr. Ramsay's knowledge, after this, [Panetti] entered a psychiatric facility and was seen by Ramsey on only a few occasions.

\*　　\*　　\*

"Dr. Eugene waters, a contract psychiatrist with the Bell County Jail, stated he first saw [Panetti] in July 1994. He testified [Panetti] was delusional and talked about 'almost mythologcal characters that [he] appeared to identify with.' Dr. Waters felt [Panetti] was preoccupied with these characters. Waters further stated [Panetti] began refusing his medications in April 1995.

"Evonne Panetti, [Panetti's] mother, testified the last time [he] came with Sonja [his wife] and his daughter to visit, he was fine at first and then all of a sudden changed. He started 'talking off the wall' and ranting and raving. She said [Panetti] would be 'Ironhorse' and 'would just look; [he] would be in a daze a lot and glaring.' She further testified

Sonja told her that Ironhorse [was] the other person that live[d] with them.

"Dr. F.E. Seale testified he treated [Panetti] for thought disorder and schizophrenia at Starlight Village Hospital. He stated it took up to 2400 milligrams of thorazine per day to keep [Panetti] under control where '100 milligrams would knock the average person out.' He further testified that without proper medication for a period of three or four days, [Panetti] could lapse into a severe psychosis. . . .

"Finally, Dr. Wolfgang Selck testified. . . . Selck stated that in 1986 ... [Panetti] was diagnosed as psychotic." *Panetti v. State, supra*, at 5, 7–9.

On direct appeal, Panetti argued that the trial court had erred in allowing him to represent himself. We disagreed, holding that the trial court had satisfied the requirements of *Faretta. Panetti v. State, supra*, at 25–28.

In his initial post-conviction application for writ of habeas corpus, Panetti argued that his conviction was void because he had been incompetent to waive his right to counsel. We held, however, that Panetti's argument had been raised and addressed on direct appeal. *Ex parte Panetti*, No. WR–37,145–01 (Tex.Crim.App.-May 28, 1998) (not designated for publication).

In his first subsequent post-conviction application for writ of habeas corpus, Panetti, citing *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, argued that the trial court's decision to permit him to represent himself violated his rights under the Eighth Amendment. We disagreed, holding that the *Indiana v. Edwards* decision was not new law and that, therefore, Panetti's application was barred by Texas Code of Criminal Procedure article 11.071, § 5. *Ex parte Panetti*, No. WR–37,145–

02, 2009 WL 3368707 (Tex.Crim.App.-Oct. 21, 2009) (not designated for publication).

Now we have before us Panetti's second subsequent post-conviction application for writ of habeas corpus. In that application, Panetti cites *Chadwick v. State*, 309 S.W.3d 558 (Tex.Crim.App.2010), in which this Court recognized, for the first time, the fact that a finding of mental illness can trump the right of self-representation. Panetti argues again that the trial court's decision to permit him to represent himself violated his rights under the Eighth Amendment. I would probably agree with the majority that our *Chadwick* decision was not new law and that, therefore, Panetti's application could be considered barred by Article 11.071, § 5.

However, I now realize that we erred in dismissing Panetti's first subsequent post-conviction application on the basis of Article 11.071, § 5. *Indiana v. Edwards* did constitute new law, because it was the first case in which the Supreme Court recognized a mental-illness-related limitation on the Sixth Amendment right of self-representation:

"[A]n individual [who is severely mentally ill] may well be able to satisfy [the] mental competence standard [of *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788], for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel ...

"The American Psychiatric Association (APA) tells us (without dispute) in its *amicus* brief filed in support of neither party that '[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant' ...

"Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Indiana v. Edwards*, 554 U.S. at 175–77 [128 S.Ct. 2379].

The *Indiana v. Edwards* mental-illness-related limitation on the Sixth Amendment right of self-representation is the very basis of Panetti's Eighth Amendment claim. In other words, it was in *Indiana v. Edwards* that the Supreme Court first suggested that the Sixth Amendment right to self-representation was not absolute and that it could be trumped by severe mental illness. We should, therefore, reconsider, on our own initiative, Panetti's first subsequent application. *See Ex parte Moreno*, 245 S.W.3d 419, 420 (Tex.Crim.App.2008).

The Eighth Amendment requires heightened reliability in the adjudicative process leading up to a death sentence. *Lowenfield v. Phelps*, 484 U.S. 231, 238–39, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Such heightened reliability is inconsistent with allowing a severely mentally ill defendant to represent himself at trial, *Faretta* notwithstanding, no matter how well he may appear to the trial court at that time. The risk of an unfair trial is too great to tolerate. The trial record in this case establishes conclusively that Panetti is severely mentally ill and has been so for a very long time. The Eighth Amendment was thus violated when the trial court permitted Panetti to represent himself.

In addition, the judiciary has an independent interest in ensuring that criminal trials appear fair to all who observe them. *Indiana v. Edwards*, 554 U.S. at 177, 128

S.Ct. 2379; *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). That interest was not served by what occurred at Panetti's trial.

I would file and set Panetti's first subsequent post-conviction application for writ of habeas corpus in order to consider his Eighth Amendment claim. Because the majority does not do so, I respectfully dissent.