[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 900 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 901 
The appellant, Tony Barksdale, was convicted of two counts of capital murder. The first count charged the appellant with murder during the course of a robbery in the first degree, and the second count charged him with murder caused by the use of a deadly weapon while the victim was in a vehicle. See § 13A-5-40(a)(2) and § 13A-5-40(a)(17), Ala. Code 1975, respectively. The jury, by a vote of 11 to 1, recommended the death penalty. After a hearing, the court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The facts of this case, as set out by the trial court, are as follows:
 "This crime occurred in Alexander City late on a Friday afternoon, December 1, 1995. Barksdale, a 19-year-old black male, had lived in Alexander City for a very short period of time previously, although he had spent most of his life in Virginia. Several weeks earlier, Barksdale came to the Guntersville, Alabama, area. There he made the acquaintance of two young white males, the co-indictee Jonathan David Garrison, and one Kevin Hilburn, both of whom lived in the Guntersville area. Hilburn was also arrested and charged with this crime, but he was deceased at the time of the trial. Garrison and Hilburn were not familiar with Alexander City. On Thursday night, Barksdale, Garrison, and Hilburn were together in the Guntersville area. Barksdale wanted to go to Alexander City, so very early Friday morning they stole a car in Guntersville and headed for Alexander City. About seven o'clock in the morning they wrecked the car near Sylacauga, but were able to obtain a ride from someone in the neighborhood, who took them to Alexander City. Throughout most of the day, they visited or came in contact with persons with whom Barksdale was acquainted, and asked several of them to take them to Guntersville. No one would. During that afternoon, they made many attempts to flag down vehicles belonging to strangers, but few would stop. Finally, one person gave them a ride as far as a local shopping center. They approached several people without success. One acquaintance testified that Barksdale said he would "jack" somebody to get back to Guntersville. Several others testified to seeing him with a gun. Barksdale had the gun when the three left Guntersville, and he was the only one armed. Barksdale told *Page 902 
the other two that he would shoot someone in order to get a ride back to Guntersville, and he would rather shoot one than two.
 "The victim, 19-year-old Julie Rhodes, worked at a store in the shopping center. As she was returning in her old Maxima [automobile] from her supper break to the parking area, Barksdale flagged her down and the three of them got in the car with the victim. Barksdale was seated in the backseat. He gave Julie directions to drive in the neighborhood, and to turn into a `dead-end' street and stop. Garrison and Hilburn got out and ran behind a nearby shed. The Maxima moved along the street past several houses, turned into a driveway, backed out, and came back down the street. Two shots were fired by Barksdale and the car stopped. Barksdale pushed Julie out of the car and told Garrison and Hilburn to get in. They went to some place in Alexander City and disposed of some things that were in the car and then drove back to Guntersville. Barksdale still had the gun and displayed it to several people. All of them were arrested several days later and the automobile and pistol were recovered.
 "Desperately seeking help and trying to escape, Julie managed to get to some nearby houses. Someone heard her screams and she was discovered lying in the yard of a house, bleeding profusely. Medics were called and she was transported to a local hospital for emergency treatment and then transported by helicopter to Birmingham. She was dead on arrival in Birmingham. She was shot once in the face and once in the back. She was bleeding to death and went into shock. She was fearful and was trying to escape her assailant, and expressed several times to various persons, including medical personnel, that she was going to die. She was correct.
 "Co-indictee Garrison pled guilty to Murder and received a life sentence. He testified for the State against Barksdale as a part of the plea agreement.
 "At the sentencing phase only, the State proved that the defendant was previously convicted in Virginia of armed robbery, a felony involving the use or threat of violence to a person."
 I.
The appellant contends that the trial court erred in denying his motion to suppress his pretrial statements. Initially, the appellant argues that the statements were taken pursuant to an illegal detention by the police and that the statements made during the custodial interrogation were therefore involuntary. Alternatively, the appellant argues that if he was, in fact, under arrest at the time he gave his statements, his arrest was illegal because the police lacked probable cause for the arrest.
This Court has addressed the question whether an individual was in custody by looking to the following guidelines:
 "The United States Supreme Court in California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275
(1983) articulated `the standard by which "custody" is to be judged.' Davis [v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985)]. In its opinion, the Supreme Court stated that `although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' California v. Beheler, supra, 463 U.S. at 1125, 103 S.Ct. at 3519-20 (quoting [Oregon v.] Mathiason, supra, 429 U.S. [492] *Page 903 
at 495, 97 S.Ct. [711] at 714 [50 L.Ed.2d 714 (1977)]. See also Primm v. State, 473 So.2d 1149 (Ala. 1985).
 "A determination of `custody' is not based on `the subjective evaluation of the situation by the defendant or the police officers.' Davis, supra at 171. Where there has not been a formal arrest (as here), an objective test is used to determine whether the suspect's freedom of action has been restricted by the police in any significant manner. Davis, supra at 171; [United States v.] Miller, [587 F. Supp. 1296, 1299 (W.D.Pa. 1984)]; Warrick [v. State, 460 So.2d 320, 322
(Ala.Cr.App. 1984)]; Hall [v. State, 399 So.2d 348, 351
(Ala.Cr.App. 1981)]. `The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position.' United States v. Jonas, 786 F.2d 1019, 1022 (11th Cir. 1986) (quoting Berkemer v. McCarty, 468 U.S. 420, [442], 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317
(1984).
 "`Pertinent factors to be considered include (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. United States v. Crisco, 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); [United States v.] Booth 669 F.2d [1231] at 1235 [(9th Cir. 1981)]; United States v. Curtis, 568 F.2d 643, 646 (9th Cir. 1978).'
 "United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985)."
Hooks v. State, 534 So.2d 329, 348 (Ala.Cr.App. 1987), aff'd,534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883,102 L.Ed.2d 1005 (1989).
"In deciding whether an accused is in custody, the court must consider the `totality of the circumstances.' Bradley v. State,494 So.2d 750, 758 (Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699
(1987). . . ." Woods v. State, 641 So.2d 316, 320-21 (Ala.Cr.App. 1993).
Here, the record reveals that the trial court held a suppression hearing before it received the statements into evidence. During this hearing, Investigator L.C. Gill, of the Marshall County Sheriff's Department, testified that he and Investigator Phil Sims took the appellant into custody around 2:00 a.m. on December 4, 1995. He testified that, after restraining the appellant with handcuffs, he placed him in the police vehicle and read him his rights, pursuant to Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), from a card that he carried with him. He testified that he then asked the appellant where he had hidden the victim's car and the appellant replied that he "didn't know nothing about no car." Investigator Gill testified that he did not ask the appellant any further questions.
Investigator Phil Sims, also of the Marshall County Sheriff's Department, testified that he interviewed the appellant at approximately 3:50 a.m. on the morning of December 4, 1995. He testified that, before questioning the appellant, he read him his rights from the Miranda waiver-of-rights form. The appellant verbally acknowledged that he understood his rights, and he signed the waiver form. Investigator Sims testified that he questioned the appellant about the events surrounding the murder and his involvement in stealing the Ford Taurus in Guntersville. He testified that the appellant admitted that he was involved in stealing the car from Guntersville *Page 904 
but merely smiled in response to the questions concerning the murder. Sims testified that the interview lasted approximately 10 minutes.
Investigator John Mashburn and Investigator Lisa White, of the Guntersville Police Department, both testified that they interviewed the appellant at approximately 9:58 a.m., on December 4, 1995. Investigator White testified that she advised the appellant of his Miranda rights in the presence of Investigator Mashburn, using the Miranda waiver-of-rights form. The appellant acknowledged that he understood his rights and signed the waiver form. Testimony indicated that the interview lasted approximately 30 minutes to 1 hour, during which time the appellant denied committing the murder and claimed to have obtained the victim's car from an acquaintance.
Investigator Sonny Riddle, of the Alexander City Police Department, testified that he interviewed the appellant from 10:21 a.m. until 10:33 a.m., on December 4, 1995. After being advised of his Miranda rights, the appellant verbally acknowledged that he understood those rights, and he signed the waiver-of-rights form. The appellant then gave a statement, which was audiotaped and later transcribed. In his statement, the appellant claimed that he was attempting to unload his 9mm semi-automatic pistol when the chamber stuck and the gun went off twice, mortally wounding the victim. Two other officers from the Alexander City Police Department conducted additional interviews with the appellant, who provided the same information he had given to Investigator Riddle. They also informed him of his Miranda rights.
There is no indication from the record that any of the appellant's statements were the result of improper police tactics. The record does not indicate any purposeful deprivations — the appellant was allowed to sleep during breaks, and was granted his requests for food and cigarettes. Additionally, there is no indication from the record that the police in any way induced, coerced, or pressured the appellant into giving a statement. There was no evidence that the appellant was in any way physically or intellectually impaired so as to interfere with his understanding of his Miranda rights, which were given before each interview.
The appellant testified that during the early morning hours of December 4, 1995, Investigator Gill and Investigator Sims took him into custody at a duplex apartment located on O'Brig Avenue. He testified that Gill "told me I was being placed under arrest for the murder which took place in Alex City." He testified that he could not remember if anyone talked to him after he was placed in the patrol car; however, he testified that no one read him his rights in the apartment or in the car. He testified that he was transported to the Guntersville City jail, where Officer Gill read him his Miranda rights. The appellant testified that when Gill asked him questions, he responded that he had "nothing to say." He testified that he was taken to a holding cell in the city jail, where he stayed overnight. He was awakened later in the morning and taken to a room where he was interviewed by Investigators White and Mashburn. On cross-examination, the appellant denied telling the investigators that a black male had given him the victim's car to drive from Alexander City to Guntersville. He testified that he was then taken to a county detention facility, and was interviewed by Investigator Riddle concerning the car theft in Guntersville. On cross-examination, the appellant admitted that he told Officer Riddle that he had been involved in the shooting but he testified that he had *Page 905 
told him that it was accidental. The appellant testified that he met with the Alexander City Officers, Walters and Chandler. He admitted that they read him his rights and that he signed the waiver-of-rights form. He then told them that he had been involved in the shooting, but that the shooting had been an accident. He further indicated that he never asked to speak to any of the police officers.
Here, the witnesses' testimony presented a credibility question.
 "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible, his decision will not be disturbed on appeal `unless found to be manifestly contrary to the great weight of the evidence.' Williams v. State, 456 So.2d 852, 855 (Ala.Cr.App. 1984)."
Ex parte Matthews, 601 So.2d 52,53 (Ala.), cert. denied,505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). Because there was ample evidence presented at the suppression hearing tending to show that each of the appellant's statements was voluntary, the trial court did not err in allowing the statements to be admitted into evidence.
The appellant, in brief, argues that Investigator Gill and Investigator Sims did not have probable cause to arrest him. Initially, we note that the appellant did not object on this ground at the trial level; therefore, the record does not contain a transcript of a probable cause hearing. Because this objection was not made at the trial level, it is to be reviewed under the plain-error standard. Rule 45A, Ala.R.App.P. The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the failure to object does weigh against his claim of prejudice. Boyd v. State, 715 So.2d 825
(Ala.Cr.App. 1997); Arthur v. State, 711 So.2d 1031 (Ala.Cr.App. 1996); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990).
Although the record indicates that the appellant was not formally arrested until after he had given his statements, it is clear from the record that Investigator Gill and Investigator Sims had probable cause to arrest the appellant when they took him into custody. "Probable cause to arrest requires `knowledge of facts and circumstances which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed the offense [for which he is arrested].'" Blanco v. State, 515 So.2d 115,119 (Ala.Cr.App. 1987). The record reveals that Gill and Sims had probable cause to take the appellant into custody, through the testimonies of several witnesses. The girlfriend of one of the codefendants testified that one of the codefendants told her about the murder and she related this information to one of her friends. Both she and the friend testified as to this conversation and testified further that the friend then went to the Alabama Bureau of Investigation ("ABI") with this information. The ABI investigator verified some of the information concerning the description of the vehicle. Investigator Gill also investigated tenants living in the apartment complex at which the appellant stayed on the night of the offense, as well as the man the appellant had forced to hide the murder weapon. Additionally, the appellant's codefendant, Jonathan Garrison, had given the police a statement, just before the appellant's arrest, implicating the appellant in the commission of the offense.
 II. A.
The appellant contends that the trial court erred in refusing to give his written *Page 906 
requested jury instructions regarding the possibility that the murder weapon was fired accidentally.
Because the appellant failed to object on this ground at trial, this Court's review of the argument will be made pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. "In order for a claim to constitute plain error, an error must not only seriously affect the substantial rights of the appellant, but must have also had an unfair prejudicial impact on the jury's deliberations."Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Cr.App. 1990).
The appellant, in his brief to the court, takes issue with the trial court's refusal to give the following requested instructions:
"Jury Charge Number 52:
 "If the shot or shots which killed the deceased was or were accidentally fired, then you must find the defendant not guilty."
"Jury Charge Number 53:
 "If the shot or shots which killed the deceased was or were accidentally fired, without recklessness or criminal negligence, then you must find the defendant not guilty."
The trial court was correct in refusing to give the requested instructions because they were misstatements of the law, in that they would have allowed the jury to find the appellant guilty of lesser included offenses.
 "A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184
(Ala.Cr.App. 1986). When requested charges are either covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to given such charges. Ex parte Wilhite, 485 So.2d 787 (Ala. 1986)."
Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App. 1992).
 B.
The appellant contends that as to Count Two the trial court's instructions were inadequate or confusing to the jury. In support of his argument, the appellant contends that the trial court gave his instructions as to the lesser included offenses of murder only as they related to Count One of the indictment, which charged murder during the commission of a robbery. He argues, however, that the trial court did not relate any of the lesser included offenses to his theory that the weapon discharged accidentally. Therefore, he alleges that "basically, the way the trial court gave the instruction, the jury could not find the Defendant guilty of any lesser included offenses if [it] found that the victim was shot while [she was] in the vehicle," as charged in Count Two. The appellant takes issue with the following portion of the trial court's instruction:
 "Is there anything lesser? Well, yes, he intentionally killed her, shot her with a pistol, she was not in the vehicle. Some lesser includeds I have just given you with that shooting. Okay. Didn't intentionally do it, felony murder, reckless murder, criminally negligent homicide, same thing. In this case, I'm not asking you to do it twice. Just telling you it is the same thing. Because, you see, under count two of the indictment, the vehicle is the thing that makes it different from just ordinary murder, manslaughter, criminally negligent homicide. It is the vehicle. That's the big difference." *Page 907 
Although the quoted portion of the trial court's charge to the jury is somewhat convoluted, this instruction in the present case was not reversible error. In reviewing jury instructions to determine if they correctly set forth the applicable law, a reviewing court must consider the charge as a whole, and the language of the charge must be given a reasonable construction, not a strained and unreasonable one. Carroll v. State, 599 So.2d 1253,1270 (Ala.Cr.App. 1992); aff'd, 627 So.2d 874 (Ala. 1993). cert. denied, 114 S.Ct. 1207 (1994). The quoted portion of the charge has been pulled out of context and thus separated from the rest of the charge, which clarifies its meaning. A review of this charge reveals that the trial court first defined and explained the elements of the two charged capital offenses. He then explained that there were lesser included offenses as to both murder and robbery in the first capital-murder charge, and separately within the "shooting" or murder component of the capital offense of murder of a victim who is shot while in a vehicle. He thoroughly explained the lesser included offenses of murder as to the first charge and then stated that those lesser offenses would also pertain to the second charge. Although he did not repeat each element of those lesser included offenses, he informed the jury that it could also find that those lesser offenses applied to the second charge. His brief listing of these lesser included charges in the second instance did not constitute reversible error because the jury had previously been informed of the definitions and elements of these offenses.
Viewed as a whole, the trial court's instructions were not misleading. The jury was given the option of finding the appellant guilty of lesser included offenses as to each capital murder charge; therefore, the appellant's argument is without merit.
 III.
The appellant next contends that the trial court erred in finding that the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" when compared to other capital offenses was applicable to the facts of this case. Specifically, he contends that the evidence did not support a finding of this aggravating circumstance in that the victim bled to death from two gunshot wounds, not having "suffered any greater than a person with gunshot wounds would suffer." Thus, he claims that the victim's murder was not "unnecessarily torturous."
The facts of this case reveal that the victim suffered extreme physical and mental pain for approximately four and one-half hours before her death. The victim begged the appellant not to shoot her. After being shot at close range in the face, the victim turned, and he shot her again in the back. The appellant then pushed the victim from her car and she managed to get to some nearby houses; she was screaming for help. She was discovered lying facedown in a crawling position, bleeding profusely, and covered in leaves. In her agony, the victim told medical personnel that she knew she was dying.
In Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or *Page 908 
brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted. See Norris v. State, [Ms. CR-94-0871, March 26, 1999] ___ So.2d ___ (Ala.Cr.App. 1999).
Thus, the trial court's finding as to this mitigating circumstance was proper in this case.
 IV.
The appellant, who was 19 years old at the time of the offense, contends that the trial court improperly failed to consider his age as a mitigating circumstance. Alternatively, he argues that even if the trial court considered age as a mitigating factor, it was not given any significance.
Because the appellant failed to object on this ground at trial, this contention is due to be analyzed pursuant to the plain-error standard. Rule 45A Ala.R.App.P. Here, the record does not support the appellant's contention. The sentencing hearing proceedings and the trial court's sentencing order indicate that the court fully considered all of the appellant's proffered mitigating evidence in determining the existence of any statutory and/or nonstatutory mitigating circumstances. See, generally, Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App. 1996). The trial court allowed the appellant to introduce evidence of his age in mitigation and it instructed the jury that it could consider age as a mitigating factor. Additionally, the trial court, in its sentencing order, specifically found that "[t]he principle mitigating circumstances offered by the defendant was his age." The trial court made the following findings concerning its determination that the appellant's age did not constitute a mitigating circumstance:
 "The defendant was 19 years of age. He was a wise and experienced 19-year-old person, who exhibited all the traits of a person who influenced others, had had some worldly experience, and had been out on his own. There is nothing significant about his age that indicates that he had led a very sheltered life, or that he was not acquainted with the ways of the world. A consideration of the acquaintances he made and the lifestyle he led, together with the fact that two years earlier he had been involved in a serious felony, convinces this Court that age is not a real factor."
It is clear from the record that the trial court considered age as a mitigating factor, and, in its discretion, properly found that it was not a mitigating factor.
 V. A.
The appellant contends that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment. However, it has previously been held on numerous occasions that death by electrocution does not constitute cruel and unusual punishment. Sullivan v. Dugger, 721 F.2d 719 (11th Cir. 1983);Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir. 1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989);Lowenfeld v. Phelps, 817 F.2d 285 (5th Cir. 1987), aff'd,484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Moreover, this Court has determined this issue adversely to the appellant. See, e.g., Stephens v. State, 580 So.2d 11, *Page 909 
26 (Ala. 1991, cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138
(1991).
 "`The United States Supreme Court addresses the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments the Court stated: "Punishments are cruel when they involve torture or lingering death; that the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies that there is something inhuman or barbarous — something more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result." Id. Accord, Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th. Cir. 1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.'
 "Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986)."
Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd,715 So.2d 852 (Ala. 1998).
 B.
In a similar vein, the appellant alleges that the sentencing scheme used in the State of Alabama violates a defendant's right of equal protection of the law.
The appellant presents nothing more than a bare allegation unsubstantiated by any argument; hence, we are unable to address the specifics of the claim. In order to demonstrate an equal protection violation, the appellant has the burden of proving the existence of purposeful discrimination against a specific protected class to which he belongs. Furthermore, the appellant must prove that the purposeful discrimination had a discriminatory effect on him. Thus, to prevail on an equal protection claim, the appellant must prove that the decisionmakers enacted the sentencing scheme to purposefully discriminate against a protected class, of which he is a member, and that he has been individually impacted by this intentional action. See McClesky v. Kemp,481 U.S. 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).
 VI.
The appellant next contends that his indictment on three counts of capital murder,[1] based on the same conduct, violated state law and the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.
 "The Fifth Amendment to the United States Constitution and § 9 of the Alabama Constitution provide protection against being prosecuted twice for the same offense. `The double jeopardy provisions confer three separate guarantees: (1) protection against a second prosection for the same offense after acquittal; (2) protection against a second prosection for the same offense after conviction; and (3) protection against multiple punishments for the same offense.' Ex parte Wright, 477 So.2d 492, 493 (Ala. 1985); see Brown v. Ohio, 432 U.S. 161, 165, 97 S.Ct. 2221, *Page 910 
2225, 53 L.Ed.2d 187 (1977); North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).
". . . .
 "The United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306
(1932), set forth the test for determining whether two charges constitute the `same offense' for double jeopardy purposes. Blockburger established the `same elements' test, which is as follows: `where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' 284 U.S. at 304, 52 S.Ct. at 183. In other words, if each offense contains an element not contained in the other, the two offenses are not the same and the double jeopardy rule does not bar any additional prosecution or punishment. United States v. Dixon, 509 U.S. 688, 696, 113 S.Ct. 2849, 2855-56, 124 L.Ed.2d 556 (1993)."
Ex parte Howard, 710 So.2d 460, 462-63 (Ala. 1997).
Although the indictment charged the appellant with three counts of capital murder, he was convicted on only two counts. Count One charged the appellant with the intentional murder of Julie Kathryn Rhodes during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Ala. Code 1975. Count Two charged the appellant with the intentional murder of Julie Kathryn Rhodes by the use of a deadly weapon while she was in a vehicle, in violation of § 13A-5-40(a)(18), Ala. Code 1975. The trial court dismissed Count Three, which charged the appellant with the intentional murder of Julie Kathryn Rhodes by the use of a deadly weapon fired from within a vehicle. Cf. Knight v. State,675 So.2d 487, 496 (Ala.Cr.App. 1995). Both of the counts upon which the appellant was convicted were based on the same act — the intentional killing of Julie Kathryn Rhodes. However, because each crime contains an element not contained in the other, there was no violation of the prohibition against double jeopardy. SeeEx parte Haney, 603 So.2d 412 (Ala. 1992) (murder for hire and murder during a robbery); Ex parte Henderson, 583 So.2d 305 (Ala. 1981) (murder during a robbery and murder done for pecuniary gain). Count One requires that the murder be committed during the course of, or during an attempt to commit, first-degree robbery, which is not an element of the charge contained in Count Two. Count Two as an element that the victim was killed by a deadly weapon while the victim was in a vehicle, which is not an element of the charge in Count One.
 VII.
The appellant contends that the prosecutor's closing argument during the guilt phase of the trial was improper because it compared him to the Nazis and Adolf Hitler.
The complained of statement is as follows:
 "[Prosecutor]: Now, friendly conversation in the car. Is that a reason to doubt or is that something that makes perfect sense to you based on everything else that you have heard, considering where he was at the moment, in the backseat and looking for a place to pull off. Heck, the Nazis used to have orchestras playing for the Jews. . . .
"[Defense counsel]: Objection, Your Honor.
"[Trial court]: Yes, that may be just a little extreme. *Page 911 
 "[Prosecutor]: Well, the point is: Putting your victim at ease, you know. I am not saying he is a member of that group.
 "[Defense counsel]: Your Honor, I object to his [comment] and move for a mistrial.
 "[Trial court]: I'm going to deny it. He didn't say that. Don't infer it. Don't even talk about that.
 "[Defense counsel]: I don't infer that at all. The point is putting your victim at ease for what purpose? For what purpose? For what purpose? To make them easy to handle until you are ready. And, that is all he did. That was what the conversation was. That is what the conversation was."
An examination of the record does not indicate that the prosecutor's remark, in the context in which it was made was intended to inflame the passion of the jury, or to be a comment on the appellant's character; nor would the jury have considered it that way when the comment is viewed within the entire charge. It was not calculated to produce a wrongful conviction. The prosecutor was attempting to make a historical analogy to the evidence in this case. The comment was not a statement of fact, but merely an argument of the prosecutor in drawing an inference from the evidence.
In Thomas v. State, 766 So.2d 860, 954 (Ala.Cr.App. 1998), the prosecutor made the following comments during his closing argument of the sentencing phase of the defendant's capital murder trial:
 "`I think the evidence is without a doubt that this unmistakably was a savage slaughter. It was almost animalistic. It goes beyond all human dignity. The evidence is that this crime was more like some kind of Nazi war crime. It goes to the point of offending all of human sensibility.
 "`Mrs. McLemore was 82 years old when she died. There's been a lot [of] talk during this case about people having the mentality of a child and of being like a child. In a lot of ways, Mrs. McLemore was like a child. . . . [W]e all return sooner or later to being a child all over again. We do it as our first days on earth and our last days on earth. I say to you that the crime that occurred here was very similar to a crime being committed against a child. This lady, because of her age, was unable to defend herself. She was an innocent prey of this Defendant.'"
Thus, in Thomas v. State, supra, the prosecutor referred to the Nazi war crimes to make a historical analogy to the factual evidence of that case, wherein a totally helpless elderly woman was savagely raped and murdered. In holding that the defense counsel's failure to object to that comment was not ineffective assistance in that case, this Court stated:
 "`"In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.'" Johnson v. State, 620 So.2d 679, 703 (Ala.Cr.App. 1992) (the prosecutor's reference to the `animalistic nature of the human mind' and his comment that the offense was `absolutely filthy, horrendously dirty and despicable' were `either proper statements of the evidence, proper inferences from the evidence, or conclusions that were properly drawn from the evidence,' 620 So.2d at 702; also the prosecutor's comment in penalty phase that the appellant was not a civilized human being was in accord with the evidence that the two victims had been brutally beaten and then their home set on fire), rev'd on other ground, 620 So.2d 709 (Ala. 1993), cert. denied, *Page 912 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235
(1993) (quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala. 1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948
(1988)). See also Taylor v. State, 666 So.2d 36, 65
(Ala.Cr.App. 1994) (characterizations of the crime as a `massacre' and of the crime scene as a `slaughterhouse' were proper inferences from the evidence), aff'd, 666 So.2d 73
(Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); McMillan v. State, 594 So.2d 1253, 1262 (Ala.Cr.App. 1991) (comments characterizing the killing as `uncivilized' and `befitting animals' were reasonable inferences drawn from the evidence and legitimate comments on the evidence); Hurst v. State, 356 So.2d 1224, 1236 (Ala.Cr.App. 1978) (prosecutor's closing remark that `[t]his man slaughtered him' did not overstep the bounds of fairness and impartiality). See also Wright v. State, 279 Ala. 543, 550-51, 188 So.2d 272, 279 (1966) ('[a]rgument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts')."'"
766 So.2d at 954-55. See also Ex parte Musgrove, 638 So.2d 1360,1368-69 (Ala. 1993) (prosecutor's comment in his closing argument during the guilt phase referring to "Adolf Hitler and 6,000,000 Jews" was proper as a reply-in-kind).
In Nicks v. State, 521 So.2d 1018, 1022-23 (Ala.Cr.App. 1987), this Court stated:
 "There is a multitude of reported cases concerning derogatory characterization of an accused by a prosecuting attorney in closing arguments. Examples of such cases can be found in Watson v. State, 266 Ala. 41, 44, 93 So.2d 750, 752
(1957); Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr.App. 1981); and the Alabama Digest. The general rule pertaining to such comments is set out in 23A C.J.S. Criminal Law § 1102 (1961), as follows:
 "`Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the purported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
 "`In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and, where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove and hence merely abusive, or which are couched in intempate and inflammatory language are . . . improper.'"
(Footnotes omitted.)
The comments the prosecutor made while in the heat of argument were not *Page 913 
improper in the context of his entire argument.
 VIII.
The appellant contends that the trial court improperly used the two convictions of capital murder during the penalty phase of the trial as aggravating circumstances. He contends that the trial court erred by applying § 13A-5-49(4), Ala. Code 1975, the aggravating circumstance of murder committed in the course of a robbery, in the sentencing phase of the trial, because to do so constitutes overlap, or "double dipping." The appellant did not present this argument to the trial court and, therefore, it must be analyzed pursuant to the plain-error rule. Rule 45, Ala.R.App.P.
This Court has repeatedly rejected challenges to the overlap provision in the Alabama capital statute. In Boyd v. State,715 So.2d 825 (Ala.Cr.App. 1997), this Court held:
 "The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as `double-counting' or `overlap' and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir. 1987); Ex parte Ford, 515 So.2d 48
(Ala. 1987); cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990); aff'd, 577 So.2d 531
(Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 "Moreover, our statutes allow `double-counting' or `overlap' and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstances encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and (50). `The fact that a particular capital offense as defined in section 13A-5-4(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.' § 13A-5-50."
Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App. 1992). See also Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App. 1994), reversed on other grounds, 677 So.2d 1025 (Ala. 1996); Windsor v.State, 683 So.2d 1027 (Ala.Cr.App. 1994), aff'd, 683 So.2d 1042
(Ala. 1996); Weaver v. State, 678 So.2d 260 (Ala.Cr.App. 1995), reversed on other grounds, 678 So.2d 284 (Ala. 1996).
 "Section 13A-5-50, Ala. Code 1975, states, in part, as follows:
 "`The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49
shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'
 "Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
 "`A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance *Page 914 
for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy.'
 "Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App. 1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)."
Burton v. State, 651 So.2d 641, 657-58 (Ala.Cr.App. 1993), aff'd,651 So.2d 659 (Ala. 1995), cert. denied, 514 U.S. 1115,115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
Thus, the appellant's argument is without merit.
 IX.
As required by § 13A-5-53, Ala. Code 1975, we address the propriety of the appellant's conviction and the sentence of death. The appellant was indicted and convicted of two counts of capital murder, see § 13A-5-40(a)(2) and § 13A-5-40(a)(17), for intentionally causing the death of Julie Kathryn Rhodes during a robbery, and for the intentional murder of Julie Kathryn Rhodes by firing a deadly weapon at her while the victim was in a vehicle.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b), Ala. Code 1975.
A review of the record shows that the trial court correctly found the existence of three aggravating circumstances: that the capital offense was committed during a robbery; that the capital offense was especially heinous, atrocious, or cruel when compared to other capital cases in that the appellant committed the act in such a way as to cause the victim great suffering before she died; and that the appellant had a prior felony conviction involving the use of or threat of, violence to the person.
The trial court considered all of the statutory mitigating circumstances and found none to exist. Although the appellant was 19 years old at the time of the offense, the trial court found his age to be no "real factor" based on his experience, lifestyle, and character. As to nonstatutory mitigating circumstances, the trial court found that the appellant offered no evidence of the existence of any such considerations. However, the trial court stated that it had "[n]evertheless . . . considered everything available to the Court in making this determination," including the presentence investigative report. The trial court considered that the appellant's parents were either separated or divorced, and that the appellant "moved from place to place" living with his mother or father. He has a GED equivalent and, although he used marijuana and alcohol, the trial court stated that "this [was] not offered for an excuse or justification." The trial court found that the aggravating circumstances outweighed the mitigating circumstances.
As required by § 13A-5-53(b)(2), Ala. Code 1975, this Court has independently weighed the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence, and is convinced that the appellant's sentence of death is the appropriate sentence. Moreover, the appellant's sentence was neither disproportionate nor excessive when compared to sentences imposed in similar cases. Hart v. State, 612 So.2d 520
(Ala.Cr.App. 1992); Kuenzel v. State, 577 So.2d 474, 530
(Ala.Cr.App. 1990); Davis v. State, 554 So.2d 1111 (Ala. 1989);Henderson v. State, 583 So.2d 276; Stephens v. State, 580 So.2d 11
(Ala.Cr.App. 1990).
We have searched the entire record for any error that might have adversely affected *Page 915 
the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P. The appellant received a fair trial. Therefore, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
LONG, P.J., and COBB, BASCHAB, and FRY, JJ., concur.
[1] Count three of the indictment charged the appellant with the murder made capital because it was committed by the use of a deadly weapon fired from within a vehicle. The trial court dismissed this count.