[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

———————————

No. 20-10993

———————————

TONY BARKSDALE,

Petitioner-Appellant,

*versus*

ATTORNEY GENERAL, State of Alabama, COMMISSIONER,
Alabama Department of Corrections, WARDEN, Holman
Correctional Facility,

Respondents-Appellees.

———————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 3:08-cv-00327-WKW-CSC

———————————

Before WILSON, JORDAN, and LAGOA, Circuit Judges.

PER CURIAM:

Tony Barksdale was sentenced to death in 1996 for murder. Since the conclusion of his direct-appeal proceedings, he has unsuccessfully sought post-conviction relief in the state and federal courts.

We granted a limited certificate of appealability to determine whether trial counsel was ineffective at the penalty phase of Mr. Barksdale's capital murder trial. With the benefit of oral argument and for the reasons set forth below, we affirm the district court's denial of habeas corpus relief on the ineffective assistance claim.

## I

In November of 1996, an Alabama jury found Mr. Barksdale guilty of capital murder. By an 11-to-1 vote, the jury recommended that he be sentenced to death, and the trial court imposed that sentence. We recount the events that led to the conviction and sentence, as well as the evidence adduced at the state post-conviction proceedings.

## A

The facts underlying Mr. Barksdale's conviction were described by the Alabama Court of Criminal Appeals (ACCA) on direct appeal. *See Barksdale v. State*, 788 So. 2d 898, 901–02 (Ala. Crim. App. 2000). We summarize those facts below.

On the evening of November 30, 1995, Mr. Barksdale—who was then 18 years old—and two friends, Jonathan Garrison and Kevin Hilburn, decided to go on a road trip from Guntersville, Alabama, to Alexander City, Alabama, where Mr. Barksdale had previously lived. In the early hours of the next morning, the three stole a vehicle in Guntersville. After wrecking the vehicle in nearby Sylacauga, they hitchhiked the remainder of the trip toward their destination. When they arrived in Alexander City, they spent the day meeting with acquaintances of Mr. Barksdale's. By nightfall, however, they did not have a way to return to Guntersville. Following several failed attempts to flag down vehicles, one person agreed to drive them as far as a local shopping center.

The victim, 19-year-old Julie Rhodes, worked at that shopping center. At 5:45 p.m., Ms. Rhodes went home for her dinner break, leaving in her silver Nissan. As she returned 45 minutes later to begin her next shift, Mr. Barksdale flagged her down and entered her vehicle along with Mr. Garrison and Mr. Hilburn. Mr. Barksdale—whom multiple witnesses testified was carrying a gun that day—directed Ms. Rhodes to drive around the neighborhood and proceed into a dead-end street. At this point, Mr. Garrison and Mr. Hilburn exited the vehicle and ran behind a nearby shed. As Ms. Rhodes attempted to reverse the vehicle out of the dead-end street, Mr. Barksdale, still inside, shot her twice: once in the back and once in the face. Mr. Barksdale then forced Ms. Rhodes out of the vehicle and ordered his friends to re-enter. The three proceeded back to Guntersville in the stolen vehicle belonging to Ms. Rhodes.

In the meantime, Ms. Rhodes—who was still alive—attempted to seek help and managed to reach a nearby house. A resident of the area heard her screams and discovered her lying in the yard of a house, bleeding profusely. Ms. Rhodes received emergency treatment at a local hospital and was then airlifted to Birmingham, Alabama. But she succumbed to her gunshot wounds on the way there.

**B**

A Tallapoosa County grand jury indicted Mr. Barksdale on three counts of capital murder and the case proceeded to trial. Thomas M. Goggans represented Mr. Barksdale at both the guilt and penalty phases. At trial, the state argued that Mr. Barksdale had shot and killed Ms. Rhodes in order to steal her vehicle and return to Guntersville. The state called 73 witnesses, including police officers, forensic scientists, the doctor who had provided emergency treatment to Ms. Rhodes, Mr. Garrison (who agreed to testify as part of a plea deal), and persons who were in the area at the time of the shooting. *See Barksdale v. Dunn*, 2018 WL 6731175, at *3−7 n.57 (M.D. Ala. Dec. 21, 2018).

Mr. Goggans conceded that Mr. Barksdale had shot Ms. Rhodes but asserted that the shooting was accidental. *See id.* at *7. Mr. Goggans presented a single witness for the defense: a firearms expert who testified about the gun's poor condition. *See id.*

At the close of the evidence, the trial court granted Mr. Barksdale's motion for acquittal on Count 3 of the indictment, which charged him with intentionally causing Ms. Rhodes' death

by using a deadly weapon while within or from a vehicle. *See id.* The jury found Mr. Barksdale guilty on the remaining two counts—intentionally causing Ms. Rhodes' death by shooting her while stealing her vehicle and armed with a deadly weapon, and intentionally causing her death by using a deadly weapon while she was in a vehicle. *See id.* at *8.

At sentencing, the state pursued the death penalty against Mr. Barksdale and sought to prove three aggravating factors: first, that the homicide was committed in connection with a robbery; second, that the homicide was heinous, atrocious, and cruel; and third, that Mr. Barksdale had a previous conviction for a crime of violence (robbery) when he lived in Virginia. *See* Ala. Code § 13A-5-49.

Mr. Goggans presented a very limited defense during the penalty phase. He did not call any witnesses, nor did he try to rebut any of the state's three aggravators. Mr. Goggans only offered a previously introduced exhibit—Mr. Barksdale's birth certificate— and rested his case. He did not present any mitigators other than Mr. Barksdale's age. During his closing argument, Mr. Goggans relied exclusively on the fact that Mr. Barksdale was 18 years old at the time of the crime and asked the jury to spare his life, making references to passages in the Bible. *See* Doc. 20-13 at 107–08, 115–18; *see also* Doc. 20-18 at 137.

The jury, by a vote of 11-to-1, recommended a sentence of death for Mr. Barksdale. The trial court imposed that sentence, finding that the state's three aggravators—which had been proven

beyond a reasonable doubt—substantially outweighed the defense's one mitigator. *See* Doc. 20-5 at 192–201. On direct appeal, the ACCA affirmed, and Mr. Barksdale's petitions for a writ of certiorari to the Alabama Supreme Court and the United States Supreme Court were both denied. *See Barksdale v. State*, 788 So. 2d at 915; *Ex parte Barksdale*, 788 So. 2d 915 (Ala. 2000); *Barksdale v. Alabama*, 532 U.S. 1055 (2001).

## C

Mr. Barksdale timely sought post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, asserting 19 different claims. *See* Doc. 20-16 at 8. The Rule 32 court summarily dismissed all but two of his claims, and set an evidentiary hearing for those claims. As relevant here, one of those claims was that Mr. Goggans had rendered ineffective assistance by failing to investigate and present mitigating evidence during the penalty phase. *See* Doc. 20-16 at 151.[1]

At the evidentiary hearing, Mr. Barksdale called four witnesses: Mr. Goggans; Mary Archie, his mother; Maxwell Johnson, a retired Marine Lieutenant Colonel who had previously housed Mr. Barksdale as a teenager; and Ernest Lee Conner, Jr., a North Carolina trial attorney specializing in capital post-conviction cases. *See* Doc. 20-18 at 2. Mr. Barksdale did not testify.

---

[1] We set out only the evidence relevant to the ineffective assistance of counsel claim before us.

Mr. Goggans offered testimony regarding his trial strategy at the penalty stage. On direct examination, Mr. Barksdale's counsel asked Mr. Goggans about his attempts to gather information regarding Mr. Barksdale's robbery conviction in Virginia. *See id.* at 89–92, 132–34. Mr. Goggans acknowledged that he never investigated the previous conviction. Specifically, Mr. Goggans had failed to contact Mr. Barksdale's public defender in Virginia, read the victim's statement, or investigate whether Mr. Barksdale had used a firearm during the robbery—a fact which the state relied on to prove the crime-of-violence aggravator beyond a reasonable doubt. *See* Doc. 20-13 at 113 (prosecutor arguing at closing that Mr. Barksdale had been previously convicted for a crime of violence).

When asked whether he had read Mr. Barksdale's confession as to the robbery, Mr. Goggans answered: "I'm not sure that I did . . . It's possible that I did, but probably not." Doc. 20-18 at 91. Mr. Goggans recalled "talking to the [victim] who was brought down to [the courthouse]" and who "indicate[d] that he recognized Tony [Barksdale]." *Id.* at 90–92. But Mr. Goggans could not recall asking Mr. Barksdale whether he had been the gunman in the robbery and his "recollection [was] that somehow he was not the one who actually had the gun[.]" *Id.* Mr. Goggans said that "there were a number of people involved" in the robbery, indicating that Mr. Barksdale had not acted alone. *See id.*

On cross-examination, Mr. Goggans testified that he had spoken to the robbery victim "in the back of th[e] courtroom"

during the trial, and that the victim "said that he . . . recognized Tony [Barksdale] from having been there." *Id.* at 131–32. Mr. Goggans explained that his decision to not contest the state's crime-of-violence aggravator was a strategic choice given the risk associated with having the victim testify against Mr. Barksdale before the jury at the penalty phase. Because he "thought a certified copy [of the robbery conviction] was going to probably come in no matter what," Mr. Goggans asserted that "we would be better off just going with the [certified copy] than putting on a live witness." *Id.* at 131−33.

With respect to Mr. Barksdale's family, Mr. Goggans claimed that he called Mr. Barksdale's mother, Ms. Archie, multiple times before trial and that she was uncooperative each time. *See id.* at 93−95. Mr. Goggans asserted that it "would be very risky" to place an uncooperative witness on the stand, and therefore made a strategic decision to not have her testify at the trial. *See id.* at 142–144. Critically, he could not recall (and the fee declaration from the trial court record does not reflect) any attempt to contact anyone other than Mr. Barksdale's parents as potential mitigation witnesses. *See* Docs. 20-6 at 5–11, 20-18 at 89–93.

Regarding Mr. Barksdale's father, Mr. Goggans testified that on the few occasions he spoke with him, his father said that his son "had gotten involved with gangs and selling drugs" and that "when he got in trouble . . . he would try to lie his way out of it." Doc. 20-18 at 96–97, 159.

At the evidentiary hearing, Ms. Archie testified that Mr. Barksdale's childhood was marked by an absence of adult supervision due to her rampant addiction to crack cocaine. *See* Docs. 20-18 at 162, 20-19 at 35. She denied, however, that her children ever saw her using drugs. *See* Doc. 20-18 at 185. She also testified that Mr. Barksdale's father had physically abused her twice in front of her children and had physically abused Mr. Barksdale when he was as young as six, on at least four separate occasions, by punching him in the chest. *See id.* at 180–81. On at least one occasion, she sought refuge at the women's shelter with her two children to escape the abuse at home. *See id.* at 176.

Ms. Archie maintained that, during Mr. Barksdale's trial, she tried contacting Mr. Goggans multiple times and that he often failed to return her calls. *See* Doc. 20-19 at 16–17. She testified that in her limited conversations with Mr. Goggans, he never asked if there were relatives or friends willing to provide information on Mr. Barksdale that might have served as mitigating evidence. *See id.* at 14.

Mr. Johnson, Mr. Barksdale's "father figure," testified that he had originally met Mr. Barksdale through his own son, who was Mr. Barksdale's middle school classmate. *See id.* at 38–39. After learning that Mr. Barksdale had a difficult situation at home, he welcomed him into his house for "several weeks if not a couple of months." *Id.* at 39. Mr. Johnson testified that during this time he learned that Mr. Barksdale had "a very difficult background [and] unhappy home life [with] parents screaming at each other" and that

he was aware of "physical violence [and] verbal abuse" by his parents. *See id.* at 42–43. Mr. Johnson also noted that Mr. Barksdale had expressed appreciation as an adolescent for the care received during this time away from home. *See id.* at 45. He was aware of Mr. Barksdale's difficulties with the law, explaining that he had been "very, very sad" when he learned of his involvement in the Virginia robbery. *See id.* at 47. Mr. Johnson testified that he had never met either of Mr. Barksdale's parents prior to the murder conviction. *See id.* at 49–50.

Finally, Mr. Conner, Jr., a North Carolina trial attorney with experience in capital post-conviction litigation, testified as to the professional standards that apply to defense counsel in such cases. He opined that Mr. Goggans' representation of Mr. Barksdale fell far below what the Sixth Amendment required for effective assistance of counsel. *See generally id.* at 85−201.

At the Rule 32 hearing, Mr. Barksdale introduced the offense/incident and pre-sentence investigation reports from his Virginia robbery case. *See* Rule 32 Exh. 21, 23. According to the incident report, the victim attempted to deliver pizza to an apartment before learning that the resident there had not placed the order. Mr. Barksdale then approached the victim, "asking where the pizzas were being delivered[.]" *Id.* at 2. Two more men showed up shortly thereafter—one of whom pointed a gun at the victim and demanded that he hand over the pizzas and money. *See id.* According to the report, the victim identified Tyrone Barksdale,

Mr. Barksdale's older brother, as the gunman. *See id.* at Supplement 4.

The Rule 32 court denied Mr. Barksdale's ineffective assistance of counsel claim as to the penalty phase on the merits. As relevant here, the Rule 32 court concluded that Mr. Goggans' failures to investigate and present mitigating evidence did not constitute unconstitutionally deficient performance and had not prejudiced Mr. Barksdale under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Barksdale*, 2018 WL 6731175, at *10.

In 2007, the ACCA affirmed the denial of Mr. Barksdale's Rule 32 petition. *See Barksdale v. State*, 14 So. 3d 196 (Ala. Crim. App. 2007); Doc. 20-26 at 127. The ACCA ruled that Mr. Barksdale's post-conviction counsel did not properly allege that Mr. Goggans failed to investigate and rebut the state's three aggravators and had thus forfeited the ineffectiveness claim. *See id.* at 157. With respect to Mr. Barksdale's claim that Mr. Goggans had failed to adequately investigate and present mitigating evidence at the penalty stage, the ACCA affirmed on the same grounds as the Rule 32 court, and also concluded that Mr. Barksdale's post-conviction counsel had failed to sufficiently plead this issue in the initial Rule 32 brief. *See id.* at 177.

Mr. Barksdale then filed a federal habeas corpus petition, asserting 32 different claims. *See Barksdale*, 2018 WL 6731175, at *11 n.69. The district court denied relief on each claim and also denied a certificate of appealability. We initially denied a certificate of appealability. *See Barksdale v. Att'y Gen. of Alabama*, 2020 WL

9256555 (11th Cir. June 29, 2020). Mr. Barksdale then moved for reconsideration. In September of 2022, we granted Mr. Barksdale's amended motion to reconsider the denial of his motion for a certificate of appealability, limited to one issue: whether Mr. Goggans had rendered ineffective assistance at the penalty phase of the capital murder trial.

## II

A district court's denial of a habeas corpus petition under 28 U.S.C. § 2254 is subject to *de novo* review. *See Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). Because Mr. Barksdale filed his petition after April 24, 1996, however, this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "establishes a highly deferential standard for reviewing state court judgments." *Parker v. Sec'y, Dep't. of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). Under AEDPA, a federal court may grant a writ of habeas corpus only if the state court's determination of a federal claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The phrase "clearly established Federal law" encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court's determination is "contrary to" clearly established federal law "if the state court arrives at a conclusion

opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413. A state court's determination is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Reasonableness is an objective standard, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. *See id.* at 410. *See also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application . . . must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citation and internal quotation marks omitted).

Under § 2254(d)(2), we presume that a state court's factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Pye v. Warden*, 50 F.4th 1025, 1034−35 (11th Cir. 2022) (en banc). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011) (citations omitted).

Finally, our review of the evidence is limited to what both parties presented at the trial and the state post-conviction proceeding. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (A federal

habeas court's review of a state court judgment is "highly circumscribed" and is "based solely on the state-court record[.]").

With these principles in mind, we address Mr. Barksdale's ineffective assistance claim.

### III

Mr. Barksdale contends that Mr. Goggans rendered ineffective assistance at the penalty phase in three ways. First, he argues that Mr. Goggans "conducted next to no investigation of facts, potential witnesses, or evidence relevant to mitigation of punishment." Appellant's Br. at 2. Second, he argues that Mr. Goggans failed to "develop, and therefore to present, a mitigation case at trial." *Id.* Third, he argues that Mr. Goggans "allowed the aggravating factors relied upon by the State . . . to go entirely unaddressed and unrebutted." *Id.* As relevant here, one of the matters that Mr. Barksdale contends warranted further investigation and could have led to a different outcome is his Virginia robbery conviction, which the state used as a prior crime-of-violence aggravator. *See id.* at 4, 14–15.

As a general matter, these claims present "mixed question[s] of law and fact subject to *de novo* review." *Williams v. Allen*, 542 F.3d 1326, 1336 (11th Cir. 2008) (citation and internal quotation marks omitted). But, as noted above, claims adjudicated on the merits by a state court are entitled to deference under AEDPA.

### A

The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does

not fall "below an objective standard of reasonableness" relative to "prevailing professional norms." *Strickland*, 466 U.S. at 686–88. That standard is necessarily flexible, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89. To that end, the relevant question is whether counsel's conduct was "outside the wide range of professionally competent assistance." *Id.* at 690. Putting AEDPA aside for the moment, we describe what a successful ineffective assistance of counsel claim entails.

To prevail on his ineffective assistance of counsel claim, Mr. Barksdale must establish two things. First, he must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, he must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

With respect to performance, courts review counsel's conduct in a "highly deferential" manner and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To overcome the *Strickland* presumption, Mr. Barksdale must demonstrate that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). In other words, if "some

reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial," *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc), then Mr. Barksdale cannot establish deficient performance.

With respect to prejudice, Mr. Barksdale must show a "reasonable probability that, absent [Mr. Goggans'] errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pooler v. Sec'y, Fla. Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) (citation and internal quotation marks omitted). In a state such as Alabama, where a jury at the time of Mr. Barksdale's conviction could recommend a death sentence by a 10-to-2 vote (and here, one juror recommended a life sentence), the question is whether there is "a reasonable probability that at least [two more jurors] would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

A "reasonable probability" is one that is "sufficient to undermine confidence [in the sentence]," and does not require a showing that "counsel's deficient conduct more likely than not altered the outcome of [the petitioner's] penalty proceeding." *Porter v. McCollum*, 558 U.S. 30, 44 (2005) (quoting *Strickland*, 466 U.S. at 693–94). Nevertheless, the likelihood of a "different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011). To assess the probability of a different outcome, courts consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in

the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (citation omitted and alterations adopted).

**B**

Mr. Barksdale challenges Mr. Goggans' performance at the penalty phase, arguing that he failed to (1) investigate certain facts and witnesses relevant to mitigation, (2) develop and present a mitigation case, and (3) address and rebut the state's aggravating factors.

In rejecting the ineffectiveness claim presently before us, the Rule 32 court ruled, and the ACCA affirmed, that Mr. Goggans "gathered background information from Barksdale and his parents 'discovering little that was helpful and much that was harmful.'" Doc. 20-26 at 167. The ACCA also expressly rejected Mr. Barksdale's argument that Mr. Goggans failed to live up to the Supreme Court's reasonable investigation standard set out in *Rompilla v. Beard*, 545 U.S. 374 (2005). *See* Doc. 20-6 at 169. The ACCA explained that there was "'room for debate' about Mr. Goggans' actions" and affirmed the Rule 32 court's conclusion that "his investigative actions were reasonable 'under prevailing professional norms.'" Doc. 20-26 at 170−71.

Notably, a court "may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied." *Waters*, 46 F.3d at 1510. Indeed, the Supreme Court has explained that "there is no reason . . . to address both components of the inquiry if the

defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. *See, e.g., Frazier v. Bouchard*, 661 F.3d 519, 532 (11th Cir. 2011) (declining to analyze the performance prong where petitioner "[could not] make the requisite showing of prejudice under *Strickland*'s second prong"). Because we conclude that Mr. Barksdale cannot satisfy the prejudice prong of the ineffective assistance standard, we need not and do not examine whether Mr. Goggans' performance was deficient.

## C

With regard to the prejudice prong of *Strickland*, the Rule 32 court held, and the ACCA affirmed, that "the aggravating circumstances clearly outweigh[ed] the mitigating circumstances presented at trial and at the evidentiary hearing," thus failing to establish prejudice. *See* Doc. 20-26 at 177. Applying AEDPA deference, we conclude that the ACCA's ruling as to prejudice was reasonable. *See Pye*, 50 F.4th at 1041–42 (under AEDPA, the question as to prejudice is whether the decision of the state court "was 'so obviously wrong that its error lies beyond any possibility of a fairminded disagreement'" and not what the federal court would have concluded about prejudice). *See also Brown v. Davenport*, 596 U.S. 118, 120 (2022) ("AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial[.]").

First, the aggravating factors—especially the heinous, atrocious, and cruel nature of Ms. Rhodes' murder—are well-established in the record. The agony endured by Ms. Rhodes from the moment she was shot twice by Mr. Barksdale until she died is

undeniable, and the jury found beyond a reasonable doubt that this aggravating factor had been proven.

Second, a portion of the evidence presented at the Rule 32 hearing that could purportedly overcome or minimize the state's aggravators was a potential double-edged sword. *See, e.g., Ponticelli v. Secretary*, 690 F.3d 1271, 1296 (11th Cir. 2012) (holding that the Florida Supreme Court reasonably applied *Strickland* by concluding that the petitioner suffered no prejudice when the mitigating evidence presented in the state post-conviction proceeding could open the door to additional damning evidence).

For example, the evidence presented by Mr. Barksdale at the Rule 32 hearing about his prior robbery conviction in Virginia was not overwhelming and could have very well done more harm than good. Any testimony by the victim to the jury would have presented a serious challenge for Mr. Barksdale regardless of who was holding the gun during the robbery. As noted by the district court, "presenting the jury with the details of the Virginia robbery would show that [Mr. Barksdale's] prior offense in Virginia involved a degree of planning and [his] involvement . . . could have been viewed by the jury as indicating a level of deviousness on [his] part." *Barksdale*, 2018 WL 6731175, at *82. And that level of planning could have been seen as similar to what Mr. Barksdale did when he flagged down Ms. Rhodes.

Third, the evidence concerning abuse suffered by Mr. Barksdale during his childhood was not overwhelming. A defendant's upbringing, background, and character are relevant

because of the long-standing societal belief that "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Because we are operating under the constraints of AEDPA, any credibility assessments made by the Alabama courts as to witness testimony are presumed correct.

The Rule 32 court noted a conflict in the testimony of Ms. Archie and Mr. Goggans in terms of the latter's efforts to contact the former while Mr. Barksdale was facing trial. The Rule 32 court noted that Ms. Archie admitted to having "made an inconsistent statement earlier that she had only spoken to [Mr. Goggans] once." Doc. 20-26 at 165. But because neither the Rule 32 court nor the ACCA resolved the conflict in the testimony, we place the same weight on the testimony of both witnesses. Although Ms. Archie recounted four instances of physical abuse against Mr. Barksdale by his father, her testimony did not reveal highly traumatic incidents of systematic physical, emotional, or verbal abuse in the household. Additionally, because Mr. Barksdale lived with his father—who did not testify at the Rule 32 hearing—from age 10, Ms. Archie was unable to shed much light on his upbringing past his middle school years. *See* Doc. 20-18 at 201. The only relevant testimony Ms. Archie provided from this period was that Mr. Barksdale felt "disgusted" at being forced to quit sports and instead having to care for his grandmother after school. *See* Doc. 20-19 at 2.

Fourth, Mr. Johnson's testimony at the Rule 32 hearing also did not help Mr. Barksdale much. Mr. Johnson testified that he took care of Mr. Barksdale, his son's classmate, for an undefined period of time, ranging from "several weeks" to "a couple of months" when he was 12 years old. *See* Doc. 20-19 at 39. Yet Mr. Johnson did not provide many details about Mr. Barksdale's life at home. Besides a conclusory statement that Mr. Barksdale endured abuse as a child, Mr. Johnson could not recount specific instances or details. *See id.* Mr. Johnson also conceded that he had only had "sporadic" contact with [Mr. Barksdale] past the age of 12 and had not learned about his death sentence until two years after the conviction. *See id.* at 67, 72. This lack of contact, spanning years, undermines Mr. Barksdale's contention that Mr. Johnson was a significant figure in his life whose testimony about him could have swayed two or more jurors to reach a different conclusion.

Moreover, both the Rule 32 court and the ACCA expressly stated that they "did not find [Mr. Johnson] to be a very credible witness" due to inconsistencies in his testimony. *See* Doc. 20-26 at 119, 173. Mr. Barksdale has not shown that this credibility determination lacked support in the record. *See Rose*, 634 F.3d at 1241.

Fifth, Mr. Barksdale's argument that Mr. Goggans should have searched for psychological, medical, and educational records, *see* Appellant's Br. at 30, is undermined by the fact that, at the Rule 32 hearing, post-conviction counsel presented no such evidence. The potential mitigating evidence here, therefore, is much weaker

than in cases like *Sears v. Upton*, 561 U.S. 945 (2010), upon which Mr. Barksdale relies. *Sears* was heard by the Supreme Court on direct appeal from state post-conviction review and thus was not a case governed by AEDPA's deferential standard. It was also decided after the ACCA's decision in this case. But even if *Sears* applied, the differences in mitigation evidence are worth highlighting. In *Sears*, post-conviction counsel presented evidence showing that the defendant suffered sexual abuse at the hands of an adolescent male cousin; that his mother referred to her children as "little mother f***ers"; and that he was "severely learning disabled and . . . severely behaviorally handicapped" as a result of "significant frontal lobe abnormalities." *See* 561 U.S. at 948–52. There is no similar evidence here.

Another Supreme Court case, this one applying AEDPA deference, leads us to the same conclusion. In *Williams*, the Court concluded that the defendant was prejudiced when defense counsel omitted critical mitigating evidence at sentencing. *See* 529 U.S. at 396–97. The evidence included a description of severe mistreatment, abuse, head injuries, and neglect during the defendant's early childhood, as well as testimony that he was "borderline mentally retarded" and failed to advance in school beyond the sixth grade. *See id.* at 370, 396. Taken together, the Court reasoned that this additional evidence "might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. The Court held that the Virginia Supreme Court had unreasonably applied *Strickland* not only by mischaracterizing the performance prong, but by equally failing to evaluate the totality of the available

mitigation evidence adduced at state post-conviction proceedings, which "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* Ultimately, the Court held that because of Virginia's unreasonable application of federal law, "Williams' constitutional right to the effective assistance of counsel as defined in *Strickland* . . . was violated." *Id.* at 399.

Mr. Barksdale did not present any records from his childhood or adolescence—whether medical, psychological, or educational—that would likely sway the jurors to not recommend a death sentence. As explained in *Strickland*, there is no prejudice— even without AEDPA deference—when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker. *See* 466 U.S. at 700.

We conclude that the ACCA's ruling that Mr. Barksdale was not prejudiced by Mr. Goggans' performance at the penalty phase was not contrary to, and did not involve an unreasonable application of, clearly established federal law. Nor was it based on an unreasonable determination of the facts in light of the evidence presented. *See* § 2254(d).

## IV

The district court's denial of Mr. Barksdale's habeas corpus petition is affirmed.

**AFFIRMED.**